Aziza RIZK, Plaintiff,

v.

**LONG TERM DISABILITY PLAN OF the DUN & BRADSTREET CORPORATION, Defendant.**

**No. 93 CV 2353 ERK.**

United States District Court,
E.D. New York.

Aug. 8, 1994.

Carl P. Maltese, Smithtown, NY, for plaintiff.

Alice B. Stock, New York City, for defendant.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

Defendant Long Term Disability Plan of the Dun & Bradstreet Corporation (the "Plan") moves for summary judgment dismissing plaintiff Aziza Rizk's claim for long term disability ("LTD") benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The Plan provides for the payment of monthly benefits to members of the Plan who become "totally disabled." "Totally disabled" is defined, for the first 180 days of disability, for 12 months thereafter,

and for a one year "elimination period," as follows:

[T]he complete inability of a member as a result of illness, accident, pregnancy, childbirth and related medical conditions, to perform any and every duty of his regular occupation if evidence thereof is provided to the satisfaction of [MetLife].

Plan, p. 4. After this initial two-and-a-half year period, "totally disabled" is defined as:

the complete inability of a member as a result of illness, accident, pregnancy, childbirth and related medical conditions, to perform any and every duty of *any gainful occupation* for which he is reasonably fitted by training, education or experience.

*Id.*, pp. 4–5 (emphasis supplied).

The Plan is administered by MetLife. The decision that Ms. Rizk was not totally disabled, which MetLife rendered after paying disability benefits for five years, was affirmed by an Appeals Committee consisting of three employees of D & B. Under the terms of the Plan, the Appeals Committee has "final authority to decide conclusively" appeals of denial of benefits made by MetLife.

The issue here is whether Ms. Rizk, who worked for over a decade as a data entry operator at D & B, sustained back injuries in two automobile accidents, the last occurring in 1985, and began receiving disability benefits in 1986, was properly deemed ineligible for LTD benefits in 1991 and 1992 under the terms of the Plan because she was no longer "totally disabled" as defined by the Plan. The benefits sought are payments of $751 each month. The benefits claimed for the period between the time of termination of coverage and the date of the complaint, April 5, 1993, total over $11,000.

## Background

On April 4, 1986 MetLife, the administrator of the Plan, received plaintiff's first disability application based on plaintiff's back injuries in the two car crashes. MetLife later received a letter from plaintiff's physician saying plaintiff was disabled with chronic lumbosacral and cervical sprain (Record pp. ("R.") 323–24, 365–66). At this time, in May 1986, plaintiff was also examined by an independent physician chosen by the plan, Dr. Davidoff, who found that plaintiff had flattening of the cervical lordosis and spasm of the paravertebral muscles of the back, but also found more "subjective than objective" disability. Nonetheless, on July 1, 1986, MetLife approved plaintiff's application for benefits.

While it paid disability benefits, MetLife continued to receive narrative reports over the next three years from plaintiff's treating physicians, Drs. Gold, Wally and Nour, all of whom charted very little improvement in the plaintiff's condition. In August of 1989, at the request of MetLife, plaintiff was assessed by another independent examining physician, Dr. Kane. After examining the plaintiff and her medical records, Dr. Kane found little evidence of objective injury, but noted degenerative arthritic changes shown on an x-ray, and a much earlier diagnosis relating to cervical spine derangement and lower back derangement. Because the of the credible evidence of subjective pain, Dr. Kane felt that the claimant should be considered totally disabled (R. 454–5)

More than a year later, during December of 1990, at MetLife's request, Dr. Nour, plaintiff's treating physician, supplied an updated functional capacity statement and narrative report with respect to the plaintiff's condition. Although MetLife requested an MRI, he did not supply one. Dr. Nour's statement said that Rizk had no limitation on grasping and handling, finger dexterity, and concentrated visual attention; that she could lift up to 15 pounds for 20% of the day, but could not do secretarial work because such work entails sitting. Dr. Nour noted limitations in all other functional areas, and indicated that he believed the plaintiff should be considered totally disabled (R. 508–511).

In April of 1991, almost five years after the initial determination that plaintiff should be considered disabled, and after receiving this report, MetLife asked an "independent vocational evaluator," Crawford & Company ("C & C"), to evaluate the reports and statements of functional capacity of plaintiff's treating physicians, the reports of the independent medical examiners, and the determinations of the Social Security Administration,

which had previously denied plaintiff coverage,[1] in order to determine whether plaintiff was totally disabled under the terms of the Plan and to identify alternative occupations for which plaintiff would be qualified based on her education, training and experience. Without meeting with plaintiff, C & C determined that plaintiff was not totally disabled from performing any gainful occupation, but rather was "capable of performing sedentary, semi-skilled occupations in the clerical areas with alternate change of position avoiding prolonged sitting"—such professions as secretary, customer complaint clerk, cashier and bank teller were suggested. C & C also recommended that a psychological exam take place to determine plaintiff's ability to work (R. 521–524). No such exam apparently ever took place.

Doctor Nour was then sent the C & C report and was asked to supply another functional capacity report. Dr. Nour replied (whether facetiously or not is unclear) that, if an occupation existed which did not entail prolonged sitting or standing, exposure to cold, humidity, drafts or air conditioning and did not require lifting or carrying more than 10 pounds or pushing or pulling heavy objects, the plaintiff should be trained for that occupation (R. 558, 562).

In May of 1991 Dr. Bert S. Horwitz, another independent medical examiner was hired by Metlife to give his opinion. Horwitz, who did no more than briefly examine the plaintiff and review the previously received medical materials, opined that Ms. Rizk suffered from chronic cervical and lumbosacral strain syndromes and is permanently partially disabled. Dr. Horwitz, however, found Ms. Rizk's complaints to be "in excess of her physical findings" and concluded that while she was totally disabled from performing work activities that "require sitting on a full-time basis" she could perform in "an occupation in which she could change positions on a frequent basis" (R. 539–40).

In addition, the record indicates that an investigator, also hired by Metlife, visited and observed Ms. Rizk and found her to be "obviously disabled," stating that she "cannot bend ... walks very slowly, seats herself very slowly and is in obvious discomfort and pain." (R. 544). Nonetheless, on September 23, 1991, MetLife terminated plaintiff's LTD benefits, relying on Dr. Nour as well as on Dr. Horwitz's opinion who "both ... indicated that you could work at an occupation where you could frequently change positions," as well as on the C & C identification of alternative employment (R. 565–66).

After this termination,, with the permission of MetLife, and after a request made by plaintiff to an Appeals Committee member, (R. 590), plaintiff forwarded an additional physician's statement of functional capacity from her treating physician, Dr. Nour (R. 572–4). That report, which was made in November 1991, describes her as "totally disabled." Dr. Nour also indicated in this report that he did not believe there was a psychological overlay on plaintiff's condition. Rather, Dr. Nour stated that the plaintiff was depressed because of her physical disability, and indicated that he would not object to a psychological exam. C & C then reassessed its prior evaluation. While noting Dr. Nour's additional diagnosis of cervical radiculopathy, C & C again found that plaintiff's subjective symptoms were not justified by the objective physical findings and that she was not totally disabled (R. 578–79).

From December 1991 onward, with MetLife's permission, plaintiff submitted additional medical reports, including a written report from Dr. Allen Josephs, opining that plaintiff was totally disabled, giving specific diagnoses and explaining that:

Physical examination demonstrates bilateral para-cervical muscle spasm and rigidity of the cervical spine. There are limitations of motion of the cervical spine especially upon rotation to the right and extension and flexion. This limited by approximately 25% to 30% of the normal range. She has hypothesis over c7 dermatome on the left side as compared to that of the right side ... Examination of the lumbar spine demonstrated marked palpable muscle spasm and rigidity. There is evidence of right dorsa lumbar scoliosis. There is evidence of radiculopathy as there is periodic

---

1. The most recent SSI determination was appealed, and is not final at this time.

pain down the right hip and leg ... Ms. Rizk's treatment is being addressed with physiotherapy, Bentryl 10mg, fiorinal with codeine, valium 10 mil., Motrin, Naturetin and Zantac 150 mil. (R. 593). MetLife also received a similar letter from Dr. Nour, stating that the patient was permanently and totally disabled (R. 612–13).

On April 29, 1992, plaintiff was again examined and her file reviewed by Dr. William Bloom, another independent examiner, who found functional difficulties in excess of the plaintiff's objective injury. Doctor Bloom agreed that plaintiff had apparent difficulty with trunk flexion and cervical spine movements, and loss of sensation of the left upper limb to a pin prick, and weakness of all muscle groups of the left upper arm. The doctor also said he could *not* tell whether plaintiff's condition was "malingering, hysteria or some other form of functional problems" and that Ms. Rizk would likely not respond to rehabilitation because of a probable psychological overlay to her condition (R. 639, 662).

When this letter was forwarded to Dr. Nour for comment, he reiterated his previous conclusions (R. 667–68). C & C then made an updated vocational assessment based on all the new information, and found plaintiff could perform such jobs as customer complaint clerk, information clerk, tourist information assistant or travel clerk. (C & C no longer opined that plaintiff could function as a secretary (R. 673)). The Plan did not change its assessment of plaintiff's eligibility for disability benefits. In July 1992, the Plan informed plaintiff's attorney that her claim had been denied. (R. 677).

The record is unclear as to whether claimant or her attorney again requested review of her claim by the Appeals Committee, or whether the receipt of additional materials was pursuant to the earlier request to the Appeals Committee. On August 4, 1992, however, the Appeals Committee, consisting of three D & B executives, John M. Johnson, Manager of Employee Benefits Administration, Janet D. Rae, Manager of Insured Plans, and Zahava Kurland, Director of Benefits and Payroll, affirmed the decision previously made, *see* letter from Alice B. Stock dated May 18, 1994 ("Stock Letter"), stating that the Committee had reviewed the physician's reports of Doctors Josephs, Nour, and Bloom. This suit followed.

## Discussion

Defendant argues that its decision to terminate the plaintiff's LTD benefits should not be disturbed unless that decision was "arbitrary and capricious" or evinced bad faith. Under that standard, defendant contends that, on the factual record, the decision to terminate benefits must be upheld. Plaintiff counters that she is entitled to de novo review of her claim and that summary judgment in defendant's favor is inappropriate.[2] Plaintiff also seeks here to present additional evidence, not received by the plan administrator below, to resolve the question of plaintiff's disability. *See Masella v. Blue Cross & Blue Shield of Conn., Inc.*, 936 F.2d 98, 104 (2d Cir.1991) (declining to decide whether de novo review permits consideration by district judge of evidence not presented to administrator). While plaintiff would be entitled to prevail under a de novo standard of review, I conclude that the arbitrary and capricious standard of review is applicable. Even under that standard, however, the defendant is not entitled to summary judgment upholding the administrator's determination.

### (1) The Standard of Review of the Plan's Decision

In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court rejected the use of a deferential "arbitrary and capricious" standard of review of trustee decisions imported from the Labor Management Relations Act to determine employee

---

2. Defendant also argues that dismissal is appropriate here because any state-law claims intended by plaintiff would be preempted. Although plaintiff has not specifically characterized her claims as either federal or common-law, and does not contest that preemption would be correct in the present case, it appears that, to the extent any such state law claims are intended (for example, breach of plaintiff's contract of employment), they would be preempted. *See, e.g., Smith v. Dunham–Bush, Inc.*, 959 F.2d 6, 9 (2d Cir.1992).

claims for benefits under ERISA. Instead, the Court held that the terms of plan documents, and the discretion and powers granted under them, were to be construed in accordance with the principles of the law of trusts. *Id.* at 110–12, 109 S.Ct. at 954–55.

Applying the established rule of the law of trusts, which requires a deferential standard of review only when a trustee exercises discretionary powers granted him under the terms of the trust, *id.* at 111, 109 S.Ct. at 954–55, the Supreme Court held that "a denial of benefits ... is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956–57. Where the plan gives an administrator discretion or authority to interpret or apply its terms, that determination will not be disturbed unless it is arbitrary or capricious or constitutes an abuse of discretion. *Reichelt v. Emhart Corp.*, 921 F.2d 425, 431 (2d Cir. 1990), *cert. denied*, 501 U.S. 1231, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991).[3]

The first question is thus whether, with respect to the factual determination that plaintiff was not "totally disabled," the Plan gives the administrator sufficient authority "to determine eligibility" to merit a deferential standard of review. The examination here focuses on the scope of the administrator's authority rather than on the extent of its discretion because the parties agree that the present factual dispute does not call on the Plan administrator to interpret or construe the language of the Plan. Nor is the determination of "total disability" inherently discretionary or subjective. Rather, because the determination before the Plan administrator was purely a matter of fact—was plaintiff "totally disabled" as that term is defined by the Plan—the relevant inquiry centers on whether the Plan gives the administrator sufficient authority to find facts and make determinations of eligibility based on those facts to merit a deferential standard of review for such administrative determina-

tions. *Compare, e.g., Murphy v. International Business Machines Corp.*, 23 F.3d 719 (2d Cir.1994) (decision of administrator to deny employee benefits under ERISA–governed early retirement incentive plan could not be disturbed unless arbitrary and capricious, where plan gave administrator discretion to deny benefits to any employee deemed, by the discretion of management, to be "necessary").

The Plan here grants the administrator:

responsibility and authority for the administration of the Plan, including the authority to interpret its provision [sic] to adopt and enforce such rules and regulations as it shall deem appropriate, to determine the amount of benefits which shall be payable to any person in accordance with the provisions of the Plan, to authorize payment of the same and pay expenses out of Plan assets and to establish benefit claim procedures.

Plan, p. 19. In addition, under the Plan, the Administrator may condition initial and continued eligibility for LTD benefits upon the member's presenting satisfactory medical evidence proving the member's claim for LTD benefits. *Id.*, p. 14–15. While this language alone would arguably be insufficient to justify a deferential standard of review, the critical feature of the Plan that tips the balance in favor of a deferential standard is the power vested in the Appeals Committee. Under the terms of the Plan, "[d]eterminations and interpretations of the Plan by the Provider of Administrative Services may be appealed to an Appeals Committee appointed by the Employee Benefits Committee consisting of not less than three nor more than five members, at least one of whom is a non-employee member of the Employee Benefits Committee." *Id.* p. 19. The Appeals Committee has "final authority to decide conclusively" appeals of denial of benefits. *Id.*, p. 20.

In view of the Appeals Committee's authority to determine a claim "conclusively," it would be anomalous for a district court to

---

**3.** For the purposes of this decision the abuse of discretion and arbitrary and capricious standards are treated interchangeably. *See DiRoma v. Nat. Org. of Indus. Trade Unions Ins. Fund*, 1992 WL 123177, *11 (S.D.N.Y.) (Leval, J.).

review that "conclusive" determination de novo. Indeed, similar language has been construed within the Second Circuit as making a deferential standard of review appropriate, at least with respect to questions of policy interpretation. *See, e.g., Haidet v. American Progressive Life & Health Insurance Co.,* 1989 WL 39670 1989 U.S.Dist. LEXIS 3840 (S.D.N.Y. April 17, 1989) (Sand, J.) (language giving administrator authority to decide matters "conclusively" made arbitrary and capricious standard appropriate); *Jordan v. United Food and Commercial Workers Local Union No. 174 Retail Pension Fund,* 1990 WL 52209 (S.D.N.Y. April 19, 1990) (Leval, J.) *citing Miles v. New York State Teamsters Conference,* 698 F.2d 593, 599 (2d Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983) (plan provision stating that decisions of trustee would be "final and binding" made deferential review appropriate).[4]

■ Under the arbitrary and capricious standard,

[a] reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one ... the [plan] must articulate a rational connection between the facts found and the choice made. While we may not supply a reasoned basis for the [plan's] action that the [plan] itself has not given, we will uphold a decision of less than ideal clarity if the [plan's] path may be reasonably discerned.

*Hedspeth v. Citicorp Individual Bank Retirement Plan,* 1993 WL 204808 *13–14 (S.D.N.Y.), *citing Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285–6, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). Thus, although limited, review of a determination under the arbitrary and capricious standard is more than

an perfunctory review of the factual record in order to determine whether that record could conceivably support the decision to terminate benefits. Rather, such a review must include a "searching and careful" determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rational and not arbitrary.

[If the fiduciary] knew of matters concerning which honesty would require investigation, and failed to act, or if it knew of matters which would honestly compel a given determination and it announced to the contrary, it cannot, in law, be regarded as having exercised good faith and its action would be arbitrary.

*Colket v. St. Louis Union Trust Co.,* 52 F.2d 390, 395–96 (8th Cir.1931), *cert. denied,* 285 U.S. 543, 52 S.Ct. 393, 76 L.Ed. 935 (1932), *cited in Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1566 n. 11 (11th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

■ A careful and searching inquiry is particularly appropriate here because of the apparent conflict of interest of the members of the Appeals Committee, consisting of three D & B executives who decided "conclusively" that plaintiff would be denied disability benefits. *Firestone,* 489 U.S. at 115, 109 S.Ct. at 957 (conflict of interest "must be weighed in determining whether there is an abuse of discretion"). It has long been established that "the fact that the trustee has an interest conflicting with that of the beneficiary is a circumstance which the court may properly consider in determining whether the trustee is acting from an improper motive in the exercise of a discretionary power." A.W. Scott, *Abridgment of The Law of Trusts* § 188 at 373 (1961). Accordingly, "a fiduciary operating under a conflict of interest may be entitled to review under the arbitrary and capricious standard for its discretionary decisions as provided for in the ERISA plan documents, but the degree of

---

4. While the Supreme Court has recently declined to resolve a conflict over the issue of whether, in the absence of policy language giving the administrator discretion to decide these matters, de novo review is required for both issues of plan interpretation and questions of fact determined by the administrator, *see Pierre v. Connecticut*

*Life Ins. Co.,* —— U.S. ——, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991) (White, J., dissenting), in the present case, the authority vested in the administrator and the Appeals Committee is sufficiently broad, as set out *Firestone,* to warrant a deferential standard of review of the factual finding.

deference actually exercised in application of the standard will be significantly diminished." *Brown,* 898 F.2d at 1568; *Zisel v. Prudential Ins. Co. of America,* 845 F.Supp. 949, 951 n. 3 (E.D.N.Y.1994) (where administrator was executive of company that self-funded plan, conflict of interest of employee would be considered in determination as to whether administrator acted arbitrarily or capriciously); *Clark v. Bank of New York,* 801 F.Supp. 1182, 1192 (S.D.N.Y.1992) (same).

While defendant here would draw a distinction between a plan like the present one that is funded by payroll deductions, and one that is funded directly by the employer, as in *Zisel,* this distinction does not eliminate the conflict of interest on the present facts. The corpus of the trust is funded by the employees for their benefit. Nevertheless, the final determination of whether benefits are to be paid to a particular claimant is made by an Appeals Committee consisting of employees who are the beneficiaries of a trust that they also financially support. There is an inherent conflict, even though it may not be disqualifying in the present context, when trustees are called upon to make decisions that could either diminish the corpus of the trust available to them or increase the cost to them of funding the trust. Indeed, perhaps recognizing this potential conflict, the Plan required at least one non-employee member on the Appeals Committee. Yet even this provision was not complied with here. Rather than including a non-employee member as required by the Plan, the committee that made the decision on Ms. Rizk's appeal consisted solely of employees. *See* Stock Letter, p. 2.[5]

Contrary to the defendant's argument, it is irrelevant that a fiduciary is not prohibited from receiving any benefits "to which he may be entitled as a participant or beneficiary in the plan ..." 29 U.S.C. § 1108(c)(1). Not only is the particular conflict addressed by the statute not present here, but the issue presented is not whether a fiduciary may wear two hats, or even three. It is whether the determination of such a conflicted fiduciary is entitled to the most deferential standard of judicial review without any account being taken of the potential conflict of interest.[6]

The record here presents not only a potential conflict between an employee as simultaneous contributor, beneficiary and fiduciary, but it also ignores the troubling fact that, after many years of finding the plaintiff to be totally disabled, the Plan, on what amounted to substantially, if not precisely, the same medical evidence of pain and disability, decided that Ms. Rizk was not disabled. While such conduct, by itself, does not conclusively establish that the determination to terminate benefits was arbitrary and capricious, it lends support to the argument that the Appeals Committee may have been less than objective when it decided to terminate Ms. Rizk's long-term benefits, and properly heightens the scrutiny given the Committee's reasoning. *See Brown v. Blue Cross & Blue Shield,* 898 F.2d at 1566 (evidence of conflict of interest may properly shift the burden of proof to that fiduciary to show that its decision was not tainted by self-interest).

■ There is no merit to defendant's argument that a conflict of interest cannot be found in a decision to deny a claim for benefits when such a decision has the effect of preserving the plan's assets. While fiduciaries are obligated to preserve the corpus of the trust from waste or other improper expenditures, they have a fiduciary and contractual obligation to award benefits when required by the terms of the Plan. *See Firestone,* 489 U.S. at 113, 109 S.Ct. at 955–56.

---

5. Because remand is justified based on the substance of the record before the Plan, I do not reach the issue of whether the improper composition of the Committee, that is the failure of the Plan to comply with its own regulations, would also support remand.

6. Thus, the Plan's assertion that there is no disqualifying conflict of interest between an employ-

ee's duties as a fiduciary to the trust and to the corporation by which it is employed, *see, e.g., Local Union 2134, UMW v. Powhatan Fuel,* 828 F.2d 710 (11th Cir.1987), and *Morse v. Stanley,* 732 F.2d 1139, 1146 (2d Cir.1984), while correct as far as it goes, is similarly beside the point.

## (2) The Decision to Terminate

■ Before applying the law to the facts of Ms. Rizk's condition, a few words are warranted regarding the procedural posture of the case. On a review to determine whether a decision of the Plan to terminate benefits was arbitrary and capricious, defendant here has moved for summary judgment under Fed.R.Civ.P. 56(c). Although it has been observed the standards for granting summary judgment "apply to ERISA actions to the same extent they do to other civil actions," *see Ludwig v. NYNEX Service Co.*, 838 F.Supp. 769, 780 (S.D.N.Y.1993), it is nonetheless also true that, "[i]n an action brought under ERISA, the contours guiding the court's disposition of the summary judgment motion are necessarily shaped through the application of the substantive law of ERISA." *Id.*

■ Under Rule 56(c), summary judgment is proper if "viewing the record in the light most favorable to the nonmoving party, the evidence offered demonstrates that there is no genuine issue of fact and that the nonmoving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–3, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Defendant thus contends that, as a matter of law, its decision to terminate plaintiffs benefits was not arbitrary and capricious and was supported by substantial evidence.

Defendant, however, supports this assertion with an analysis of Rule 56 focussing on the question of whether plaintiff has demonstrated that a material issue of fact has been raised, rather than on the question of whether defendant is entitled to judgment as a matter of law. This approach would make more sense in the context of *de novo* review, or in a proceeding where the parties had the opportunity to present additional evidence to the district court. In the present context, however, the district court sits in effect as an appellate court to determine whether the denial of ERISA benefits was arbitrary and capricious. Under the circumstances, while the distinction may be more a matter of form than of substance, the motion is more properly considered as one akin to a motion under Rule 12(c) for judgment on the basis of the pleadings and the transcript of the record before the Plan. *Cf. Igonia v. Califano*, 568 F.2d 1383, 1387 (D.C.Cir.1977) (where court's review is limited to whether, on the record, there is substantial evidence to support an agency finding, and additional evidence is obtained by remand, the district court performs an essentially appellate function); *Orlandini v. Weinberger*, 421 F.Supp. 586, 589 (D.Wis.1976) (motion for judgment affirming decision of administrator in Social Security cases is more akin to one for judgment on the pleadings under Rule 12(c) than for summary judgment under Rule 56, and court would treat it as such).

■ On the record as it stands, the evidence does not indicate that the Plan is entitled to judgment affirming the decision to terminate Ms. Rizk's benefits. Instead, an objective review of the evidence before the administrators, as informed by the Plan's apparent conflict of interest, demonstrates that the Plan's expressed reasons for terminating benefits did not support the action taken.

Dr. Nour's opinion, upon which the Plan relied, does not provide a rational basis for the administrator's decision to terminate benefits because he opined only that Ms. Rizk "ought to be trained" for any job which she might be able to perform under the remarkably limited conditions listed by him—not that she had been rehabilitated and would have been able to perform any such job. Moreover, Dr. Nour later clarified his opinion, and restated that he found the plaintiff to be totally disabled from any gainful occupation.

Dr. Horwitz's opinion, on which the administrator also initially relied, similarly cannot, without more, create a rational basis for the decision to terminate claimant's benefits. That opinion fails to address the claimant's functional limitations, that is the extent of her pain—which Dr. Horwitz himself observed—and does not make any medical determination as to their source (for example, whether they have a psychiatric basis or constitute malingering). Rather, Dr. Horwitz identifies the objective injuries documented thus far without himself conducting

further diagnostic tests, and opines that, in view of the extent of the documented injuries, plaintiff's subjective disabilities (whose existence he does not explicitly question) "seem" excessive.[7]

Dr. Bloom's opinion, cited by the administrator in its last decision to uphold the termination of benefits, also declines to identify any source of the plaintiff's apparent pain and disability, and adds that he cannot tell whether it is "malingering, hysteria, or some other form of functional problem," and refers to a psychological overlay to Ms. Rizk's condition. Moreover, Dr. Bloom specifically opines that he does not feel Ms. Rizk can be rehabilitated.

Thus, the decision to terminate plaintiff's benefits appears to based on an assumption unsupported by any evidence in the record. The administrator (and the vocational specialist), both of whom apparently never spoke to or saw the plaintiff, seem to have speculated that, because there was no extensive "objective" medical correlation to plaintiff's disability currently in the file, she must be malingering, that is her pain must not be as extensive as she claims (and the doctors observed) it to be. In making this assumption, however, the administrator ignored the actual substance of Dr. Horwitz's and Dr. Bloom's opinion: that plaintiff's subjective pain and disability were more extensive than the objective accounts thus far received of her medical condition would warrant. Dr. Kane, the only Plan doctor who explicitly considered how much pain the plaintiff was in, and whether that pain was disabling, in fact found the evidence of extensive subjective pain to be credible, and therefore grounds for disability. Obviously, however, even a "functional" or psychological problem based on pain which incapacitated plaintiff (like the one opined by Dr. Horwitz and Dr.

Bloom to perhaps exist) would have still have constituted an incapacitating disability—and have rendered termination of benefits inappropriate.

In addition, although defendant was given the opportunity to conduct a psychiatric exam of the plaintiff to determine whether a diagnosable mental disorder, either dependent on or independent of her physical injury, contributed to her disability, and whether treatment would have potentially alleviated her disability, the administrator chose not to do so. Thus, the administrator appears to have skipped over the possibility that Ms. Rizk had a functional or psychiatric disability aggravating her physical condition, and settled on the conclusion that plaintiff was malingering, in whole or in part, without any factual basis.

Such speculation by the administrator does not and cannot amount to a reasonable basis in this case for the decision to terminate benefits as a matter of law. It is unsupported by either medical testimony or objective observation that confirms plaintiff is actually malingering (that is, that her pain is not as extensive as she claims). Although Dr. Nour indicated that he did not feel Ms. Rizk's condition had a psychological overlay independent of her physical injury, he clearly stated that in his opinion her psychological difficulties were caused by physical pain. No other medical explanation for her subjective accounts of pain and disability appears in the record. Aside from that one telephone call to Dr. Nour, there is no evidence of any attempt in the record to rule out or address a psychological or functional cause contributing to the extent of plaintiff's disability. See Cutignola v. New York Tel. Co., 1984 WL 1324, *5 (S.D.N.Y.) (administrator, as fiduciary, has duty of developing the reasonably available evidence bearing upon the claim).[8]

---

7. The reliance on the C & C report—which begins with the undocumented assumption that plaintiff's pain is not debilitating or extensive—appears similarly misplaced. The problem with C & C's determination is not its finding that, given the plaintiff's physical condition, there are particular jobs she can do, but rather, that, on the facts of the case, it is unclear whether C & C ever received an accurate picture of the plaintiff's condition, so that its identification of possi-

ble jobs for Ms. Rizk had some meaning in relation to her actual disabilities.

8. Defendant argues that it was under no obligation to further investigate plaintiff's condition, because the Plan language places the burden of establishing disability on the claimant, and because the claimant had not "sought treatment or presented evidence" of her disability to the administrator. See Sandoval v. Aetna, 967 F.2d 377 (10th Cir.1992). However, this case is a far cry

Moreover, defendant's own investigator found the plaintiff, at a functional level, to be "obviously disabled." Id. at *5 (disregard of persuasive evidence tending to support entitlement, notwithstanding substantial evidence supporting denial, constitutes arbitrary and capricious action). *See also Brown v. Blue Cross & Blue Shield*, 898 F.2d at 1566 n. 11 ("an improper motive sufficient to set aside a fiduciary's decision may be inferred from the fiduciary's failure to investigate or to interpret honestly evidence that greatly preponderates in one direction").

In the face of six years of consistent and undisputed medical evidence of extensive functional limitations on plaintiff's ability to sit, move, carry, and operate under varying temperature conditions, as well as substantial subjective evidence relating to plaintiff's pain, discomfort and psychological distress, I find that the termination of plaintiff's benefits cannot be sustained on the present record. Because reexamination or further development of the record is necessary to a final determination of plaintiff's entitlement to benefits, the appropriate remedy here is to remand the case to the Plan for investigation and reconsideration in light of this opinion. *See Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1309 n. 7 (5th Cir.1994) (remand rather than reversal is proper remedy when administrator's decision is arbitrary and capricious); *Catania v. NYSA–ILA Severance Ben. Fund*, 1992 WL 176502, *9 (S.D.N.Y.) (where decision was arbitrary and capricious because of trustees' reliance on irrelevant personal experience in making determination, case would be remanded).

SO ORDERED.

from *Sandoval*. Here plaintiff "presented evidence" to the administrator on a timely basis that she is disabled by pain, and the administrator has not given any credible reason for the failure to consider or follow up on that evidence. Indeed, the administrator's own doctors suggest that the plaintiff has a psychological disability, and that her pain is in part a function of this disability. Moreover, while the defendant argues that any psychological exam would be futile, because the language of plan excepts coverage for long term mental disabilities, it does not necessarily follow that emotional disability caused by serious and debilitating physical pain renders the plaintiff ineligible for coverage. Similarly, the conduct of a psychological exam would also shed considerable light on the source of the plaintiff's claimed disability, and indicate the extent to which she indeed was, as apparently believed by Plan administrators, malingering.