**Theron L. DURR, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

**No. 3:97 CV 951(GLG).**

United States District Court, D. Connecticut.

July 29, 1998.

---

Thomas W. Bucci, Willinger, Shepro, Tower & Bucci, Bridgeport, CT, for Theron L. Durr, Plaintiff.

Thomas F. Maxwell, Jr., Marsh, Day & Calhoun, Southport, CT, for Metropolitan Life Ins. Co., Defendant.

## MEMORANDUM DECISION

GOETTEL, District Judge.

Pursuant to Federal Rule of Civil Procedure 56, defendant Metropolitan Life Insurance Company ("MetLife") moves for summary judgment. For the reasons discussed below, defendant's motion (Document # 9) is DENIED and this Court GRANTS summary judgment in favor of plaintiff Theron L. Durr.

## BACKGROUND

This case arises from defendant's denial of disability benefits to plaintiff under the terms of the MetLife Options Plus Program ("Plan"), which provides insurance, welfare benefits, and retirement benefits to MetLife employees. In 1988, while plaintiff was employed at MetLife as a Personal Insurance Account Representative, plaintiff was diagnosed as having five aneurysms. Between 1988 and 1989, he underwent several surgeries to repair four of the aneurysms which were located mostly in the abdomen and leg areas. After each of these surgeries, plaintiff required periods of recovery ranging from one week to several months. In November 1995, plaintiff was diagnosed as having two additional aneurysms in the abdomen area. To repair these aneurysms, plaintiff underwent two separate surgeries in November 1995 and February 1996. He returned to work on May 6, 1996 following his recovery from these last surgeries.

On August 30, 1996, which was about when plaintiff last worked at MetLife, plaintiff applied for temporary disability benefits. In support of his application, he submitted a doctor's statement completed by his treating physician, Dr. George J. Todd, who is Chief of the Vascular Surgery Division of Columbia

Presbyterian Medical Center. Dr. Todd indicated that plaintiff became unable to work on November 27, 1995 due to bilateral iliac artery aneurysms and peripheral vascular disease. He did not state when, if at all, plaintiff would be able to perform his usual work in the future. Claim File, Hartz Aff. Ex. 2, at 300.

Meanwhile, plaintiff received salary continuance benefits for one week through September 6, 1996. According to the Summary Plan Description of the Plan ("SPD"), if a Personal Insurance Account Representative is absent due to a disability and is being actively treated for the disabling condition, he or she will receive compensation continuance benefits equal to 100% of his or her pay for the first four full calendar weeks during the employee's absence. SPD, Hartz Aff.Ex. 1, at STD–13. As long as the employee's disability continues, the employee thereafter is eligible for temporary disability benefits for a maximum of twenty-three weeks. Temporary disability benefits begin on "the Monday following four full calendar weeks of your disability provided: your disability has been continuous; and you are under a doctor's care and are receiving active medical treatment for the disabling condition." *Id.* During this time period, the employee would receive benefits based on a percentage of his or her average weekly pay, depending on the number of years of continuous service with MetLife. If the disability continued beyond the twenty-seven week period, the employee could apply for long-term disability benefits.

As the claims administrator and fiduciary for the Plan, MetLife denied plaintiff's claim for weekly disability benefits on November 21, 1996. It determined that "there is insufficient medical evidence documented to support the existence of a fully disabling condition preventing you from performing your own occupation as an Account Representative beginning September 7, 1996." Claim File, Hartz Aff.Ex. 2, at 32. According to MetLife, Dr. Todd did not provide documentation showing that plaintiff had any current aneurysm formations. MetLife also disputed Dr. Todd's opinion that plaintiff's "persistent work will contribute to development of further aneurysms which may be fatal," because

it asserted that "a clear association with stress and aneurysms has not been established." *Id.* Finally, MetLife found that plaintiff appeared to be receiving precautionary, and not active, medical treatment. Plaintiff subsequently requested a review and reconsideration of this decision.

In response to plaintiff's appeal, defendant referred plaintiff's file to Network Medical Review Company ("NMR") to have an independent physician review his claim. NMR is a medical consulting firm unaffiliated with MetLife. Specifically, defendant directed NMR to determine whether plaintiff "is and has been since September 7, 1996 fully disabled preventing him from performing his own job as an account representative." *Id.* at 206. NMR's review was conducted by Dr. Robert D. Petrie, who is a Diplomat of the American Board of Preventive Medicine, Occupational Medicine, and the American Board of Family Practice.

In a report dated February 6, 1997, Dr. Petrie found that there "is no evidence in the record to support a claim of sole or total disability. . . ." *Id.* at 212. After reviewing plaintiff's medical records, Dr. Petrie determined that "[t]he claim of total disability does not appear to be based upon Mr. Durr's inability [to][sic] perform his job, but rather the potential risk which would be posed to his health by working." *Id.* at 211. He also found that "there is insufficient evidence that Mr. Durr's hypertension is not adequately controlled." *Id.* at 212. Finally, he concluded that Mr. Durr "recovered from his most recent surgery and has no demonstrated impairment which would prevent him from performing the job activities of an Account Representative." *Id.*

Based on Dr. Petrie's report, on February 14, 1997, MetLife upheld the denial of plaintiff's claim. Plaintiff then submitted a letter from Dr. Todd dated February 19, 1997 urging MetLife to reconsider its position and to find that plaintiff's condition rendered him disabled. MetLife forwarded this letter to Dr. Petrie at NMR for his review. On March 5, 1997, Dr. Petrie wrote a second report indicating that his earlier opinion had not changed, despite Dr. Todd's letter. A

week later, MetLife issued its final decision disallowing plaintiff's claim.

Plaintiff then brought suit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), claiming that he was wrongfully denied disability benefits. He requested equitable relief in order to receive temporary disability benefit payments retroactive to September 7, 1996.[1] Defendant subsequently moved for summary judgment. Defendant does not dispute that the Plan is an employee welfare benefit plan, as defined in 29 U.S.C. § 1002(1), and is governed by ERISA. Rather, defendant contends that plaintiff is not fully disabled within the Plan's meaning.

■ While only MetLife formally moved for summary judgment, plaintiff alternatively argued that he was entitled to summary judgment in his favor based on the alleged arbitrary and capricious denial of his claim for disability benefits. Pl.'s Mem. at 21. In the Second Circuit, a district court may *sua sponte* grant summary judgment in favor of a nonmoving party to expedite litigation. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991). Moreover, under the arbitrary and capricious standard of review (which we apply in this case), a district court is limited in the scope of its review and may consider only the administrative record (i.e., the Claim File) before the administrator when it made its decision. *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir.1995). Consequently, a district court reviewing an ERISA denial of benefits is effectively functioning in an appellate capacity because it is precluded from considering new evidence. *See Rizk v. Long Term Disability Plan of Dun & Bradstreet Corp.*, 862 F.Supp. 783, 791 (E.D.N.Y.1994) (stating, in a decision on a summary judgment motion for an ERISA denial of benefits, that the motion is more properly considered one under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings). Thus, we find that it is appropriate to decide this case on the basis of the papers before us.

## DISCUSSION

■ ERISA does not specify the standard of review for cases involving a denial of benefits. Both parties agree, however, that this Court must apply an arbitrary and capricious standard when reviewing MetLife's decision because, as the Plan's fiduciary and claims administrator, MetLife has discretionary authority to determine eligibility for benefits and to interpret the Plan's terms. Pl.'s Mem. at 12; Def.'s Mem. at 4–5; *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also* SPD, Hartz Aff.Ex. 1, at OI–62 & OI–69. This scope of review is narrow and is highly deferential to a plan administrator's determination. *Jordan v. Retirement Committee of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir.1995). Accordingly, a district court can overturn a denial of benefits only if the plan administrator's decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995) (citations omitted). A district court also cannot substitute its judgment for that of the plan administrator. *Id.*

■ In the complaint, plaintiff asserted that defendant was operating under a conflict of interest when it decided to deny him disability benefits. In the Second Circuit, a district court must apply the arbitrary and capricious standard unless a plaintiff proves that the "conflict affected the choice of a reasonable interpretation." *Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1255 (2d Cir.1996); *see Whitney v. Empire Blue Cross and Blue Shield*, 106 F.3d 475, 477 (2d Cir.1997) (discussing the Second Circuit's rules under *Sullivan* and *Pagan* for applying a less deferential standard of review). If a plaintiff shows that a conflict

---

1. Pursuant to 29 U.S.C. § 1132(c)(1)(B), plaintiff also requested an amount of up to $100.00 per day for every day that defendant allegedly failed to provide him with a copy of the summary plan description. Section 1132(c)(1)(B) provides that a district court in it discretion may award such an amount if a plan administrator does not pro-vide plan documents within thirty days of receiving a request from the beneficiary. Here, however, neither party addressed this issue in their summary judgment papers. Under these circumstances, we do not rule on this claim because it raises a factual issue not determined by this decision.

exists, a court must determine whether the administrator's decision was reasonable in light of potential conflicting interpretations of the plan and whether the plaintiff has proven that the administrator was in fact influenced by the conflict of interest. *Sullivan*, 82 F.3d at 1255–56. Once these two factors are established, the district court must interpret the denial of benefits *de novo*. *Id.* at 1256. Besides the conclusory statement in the complaint that MetLife's decision to deny plaintiff benefits was tainted by an inherent conflict of interest, plaintiff does not adduce any facts or evidence tending to establish the existence of a conflict or how a conflict, if it existed, affected the reasonableness of Met-Life's determination. In the absence of such proof, this Court will continue to apply a deferential standard to defendant's decision.

██ Plaintiff contends that defendant acted arbitrarily and capriciously because it was unreasonable for defendant to disregard the evidence in his claim file establishing his eligibility for disability benefits. To receive temporary disability benefits, an employee must submit a claim no later than thirty days after the date on which the injury or sickness began. In support of a claim, an employee must provide proof of disability within a specified time. According to the SPD, a participant is fully disabled if "you are unable, as determined by the insurance company, due to an illness or injury, to perform any and every duty of your regular job." SPD, Hartz Aff. Ex. 1, at STD–4. Plaintiff asserts that Dr. Todd's opinions, his medical records, and his medical history all support his claim.

Plaintiff has been Dr. Todd's patient since he was referred to Dr. Todd in December 1987 for evaluation and treatment of his aneurysms and peripheral vascular disease. Dr. Todd wrote three letters to MetLife in support of plaintiff's claim. The first letter, dated February 8, 1996, described plaintiff's most recent surgery of November 30, 1995 which was performed to repair a "huge right internal iliac artery aneurysm." Claim File, Hartz Aff. Ex. 2, at 17. Dr. Todd stated that:

[plaintiff's] recovery from this extensive surgery has been steady but prolonged. He remains weak and has constant pain from his abdominal incision which limits his ability to move from either a seated to a standing position and also limits his ability to ambulate. Although he is not showing any signs of infection or other complications of the procedure itself, his recovery is far from complete and I have recommended that he continue to rest and allow the healing process to proceed and have advised him not to return to work at this time. The patient has been under my care for many years now and has undergone multiple operations and my experience with Mr. Durr is that he has always been quite anxious, at times perhaps even too anxious, to return to work. Given his past history, I am sure that his complaint of disability is real and I feel that he should be allowed to recover further at home and should not be denied disability benefits.

*Id.* Dr. Todd again wrote to MetLife on November 12, 1996 after seeing plaintiff on September 6, 1996 to monitor plaintiff's recovery from the November 1995 surgery. He explained that:

although his incisions had healed following the surgery, *it is clear that the toll which has occurred upon his body as a result of many aneurysm operations and heart surgery has been such that he no longer is able to work.* In addition, *I am quite concerned that the continued stress both physical and mental from persistent work will contribute to development of further aneurysms which may be fatal.*

*In my opinion, Mr. Durr has a very unusual medical condition of multiple aneurysm formation and should be considered to be disabled as a result of his condition.* Mr. Durr has worked with this condition for as long as he possibly can and in fact, in my opinion, has worked much longer than the average person would ever have considered. He is disabled and I think that continued attempts on his part to remain employed will be injurious to his health.

*Id.* at 24 (emphasis added). Finally, after plaintiff appealed MetLife's initial decision, Dr. Todd wrote another letter on February 19, 1997. He asserted that:

[o]nce again, I think it is important to emphasize that Mr. Durr has an *extraordi-*

*narily unusual constellation of medical problems which has resulted in multiple aneurysms throughout his arterial system. There is absolutely no doubt in my mind that he is at risk for further aneurysms and for rupture of an aneurysm.*

It is my best medical judgement that the development, enlargement, and possible rupture of aneurysms can be contributed to by factors which increase stress. Despite the fact that all of the aneurysms that have so far been identified have indeed been repaired, *I feel that continued employment will put Mr. Durr at increased risk with regard to his aneurysm condition.*

Despite many operations in the past, Mr. Durr has always returned to employment and it is clear, if he were physically able to return at this time, he would do so. Because of his unusual medical condition, I have advised him that he should avoid stress inducing activities such as the employment that he had previously been engaged in.

*It is my judgement that he is disabled because of his unusual propensity for aneurysm formation, the result of his multiple surgical procedures in the past, and as a result of his risk for stress related aneurysm rupture.*

*Id.* at 236 (emphasis added).

In addition to Dr. Todd's opinions, plaintiff contends that his claim is supported by his medical and hospital records contained in the Claim File. He argues that these records detail his medical condition and the various treatments he underwent. Indeed, the Claim File documents at least twenty-five pertinent hospital admissions at New Milford Hospital and Columbia Presbyterian Medical Center between February 1987 and November 1996. *See id.* at 197–98 (2/3/87–2/5/87); 215–16 (1/26/88–1/28/88); 217–21 (2/17/86–2/29/88); 222, 226 (9/27/88–10/11/88); 227 (7/29/89); 83–85, 195–96 (10/22/89–10/31/89); 86–87 (6/9/90–6/12/90); 193–94 (3/31/91); 88, 191–92 (9/14/95–9/18/95); 12–13, 19, 228–29 (9/25/95–9/28/95); 173 (11/27/95); 8–11, 230–31 (11/28/95–12/7/95); 172 (1/9/96); 171 (2/6/96); 18 (2/9/96); 14–16 (2/22/96); 170 (3/27/96); 169 (4/16/96); 168 (5/15/96); 166–67 (6/6/96); 164–65 (6/13/96); 89–163, 174 (7/5/96–7/7/96); 158 (7/10/96); 157 (8/7/96); and 34–82 (11/22/96–11/26/96). During these hospital visits, plaintiff was treated for multiple aneurysms, cellulitis, sepsis, chest pain, peripheral arteriosclerotic vascular disease, hypertension, lipid disorder, and aortic valve and arch replacement, among other things. Plaintiff's medical records also indicate that he suffered a brain stem stroke in 1980.

Based on plaintiff's claim file, we find that it was unreasonable for defendant to have determined that "one treatment date being September 6, 1996 would not constitute active treatment." *Id.* at 32. After plaintiff's November 1995 surgery, the Claim File indicates that plaintiff was seen at least once per month at New Milford Hospital and Columbia Presbyterian Medical Center for testing between January and September 1996. *See id.* at 14–16, 18, 157–58, and 164–72. Additionally, plaintiff was seen by more than one doctor during this time, including Dr. Todd, Dr. Allan Schwartz, a cardiologist at Columbia Presbyterian Medical Center, and Dr. Alfred Cretella, an internist at New Milford Hospital. While defendant may not have had these records when it issued its November 21, 1996 decision, these records were certainly included in plaintiff's claim file before defendant reached its final opinion on March 12, 1997. Consequently, we find that it was arbitrary and capricious for defendant to conclude that plaintiff had not shown he was "under a doctor's care and ... receiving active medical treatment for the disabling condition." SPD, Hartz Aff.Ex. 1, at STD–13.

Plaintiff next argues that defendant's decision to deny him benefits based on a lack of objective medical evidence was arbitrary and capricious. Defendant does not dispute plaintiff's history of aneurysm formation. Indeed, Dr. Petrie stated that the "diagnosis is not in question, nor is the risk that Mr. Durr will have further aneurysms or an aneurysmal rupture." Claim File, Hartz Aff. Ex. 2, at 246. Rather, defendant contends that plaintiff did not provide any evidence demonstrating that his condition rendered him unable to perform any and every duty of his regular job. Defendant particularly con-

tests plaintiff's treating physicians' opinions that physical and mental stress from continued employment would contribute to the rupture of existing aneurysms and the formation of more aneurysms which could be fatal. According to defendant, plaintiff did not sustain his burden of proving his disability by merely submitting his medical and hospital records and his treating physicians' opinions stating that continued employment would be injurious to his health, if not fatal. Instead, defendant suggests that plaintiff should have supplied published studies, articles, or texts on the issue of causation. Without these, defendant asserts that plaintiff "provided no evidence that his job indeed caused such stress. Moreover, he provided to Support to show a connection between such stress, if in fact any existed, and aneurysm formation." Def.'s Mem. at 10.

We find that defendant's denial was arbitrary and capricious because administrators and fiduciaries are prohibited from adding a term or extra requirement into an insurance policy that is not expressly part of it. *Miles v. New York State Teamsters Conference Pension and Retirement Fund,* 698 F.2d 593, 599 (2d Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983); *see Duncan v. Continental Cas. Co.,* Civ. No. 96–2421, 1997 WL 88374, at *4 (N.D.Cal. Feb.10, 1997) (holding that an insurance company could not deny a claim for long-term disability benefits based on a lack of objective medical evidence when the original policy did not refer to the objective medical evidence standard and never defined that term); *Velez v. Prudential Health Care Plan of New York, Inc.,* 943 F.Supp. 332, 342 (S.D.N.Y.1996). This action alone would support a finding that a fiduciary has acted arbitrarily and capriciously. *Miles,* 698 F.2d at 599. Here, the SPD nowhere provides that employees must submit objective medical evidence in support of their claims. Despite defendant's assertions that plaintiff bore the burden of demonstrating a link between stress and aneurysm formation and/or rupture, the SPD does not require employees to provide information on the cause of the disabling conditions. *See Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 443 (3d Cir.1997) (concluding that it was arbitrary and capricious for a plan

administrator to require the plaintiff to submit objective medical evidence, in a case where the plaintiff suffered from chronic fatigue syndrome, because the plan nowhere stated that "a claimant must provide clinical evidence of the etiology of the 'condition' that renders him disabled"). Instead, plaintiff submitted what was required of him under the SPD—proof of his disability—by providing copies of his medical records, his medical history, and three doctors' opinions stating that he is disabled. Thus, it was unreasonable for defendant to interpret the SPD as requiring plaintiff or plaintiff's treating physicians to provide MetLife with published studies, articles, or texts showing a connection between stress and plaintiff's condition.

Moreover, even though defendant's letters denying plaintiff's claim state that Dr. Todd never provided "back-up" documentation, defendant never requested this type of information from him. With regard to denied claims, the SPD provides that "[w]hen applicable, you will be told *what additional information is required* from you and *why it is needed."* SPD, Hartz Aff.Ex. 1, at OI–63 (emphasis added). Yet, defendant did not follow this procedure. When defendant requested information from Dr. Todd, it asked him to provide only copies of laboratory work and diagnostic testing, copies of office notes, a prognosis of plaintiff's condition, including when, if at all, plaintiff could return to work, plaintiff's medical records, and his treatment history, including information on prescribed medications and his physical response to treatment. *See* Claim File, Hartz Aff.Ex. 2, at 4, 6. MetLife also contacted plaintiff to request that Dr. Todd supply current medical information, but plaintiff was not asked specifically to provide documentation on the cause of his condition. *Id.* at 26. Consequently, because defendant does not offer a reasonable interpretation of the SPD that would require employees to provide objective medical evidence on the cause of their disabling conditions, we find that defendant acted arbitrarily and capriciously.

·For these reasons, we find that Dr. Petrie's opinion carries less weight than it would if the SPD required an employee to provide objective medical evidence on the

cause of the disabling condition. Dr. Petrie's two reports, particularly his last report of March 5, 1997, are largely based on his finding that plaintiff did not provide evidence showing that the stress of plaintiff's job could result in aneurysm formation and/or rupture. He stated that:

> [t]his claim is based upon several unsubstantiated assumptions including: 1) The major source of "stress" for Mr. Durr is employment; 2) Employment-related "stress" will result in the development, enlargement, and possible rupture of an aneurysm (presumably due to blood pressure elevations); 3) That work-related stress does result in measurable increase in blood pressure; and 4) That any stress-related volatility of blood pressure is not amenable to pharmacologic intervention. Appropriate records have not been provided to support these claims....

*Id.* at 247. As mentioned above, however, the SPD does not require employees to provide objective medical evidence to support their claims. Moreover, MetLife never requested this specific type of information from plaintiff or plaintiff's treating physicians.

■ Nevertheless, defendant argues that it was not required to give conclusive weight to plaintiff's treating physicians' opinions, and could rely instead on the opinion of Dr. Petrie, who never personally examined plaintiff. In the context of Social Security Act cases,[2] a treating physician's opinion is generally given greater weight than a non-treating physician's opinion. 20 C.F.R. § 404.1527(d)(2); *Schisler v. Sullivan,* 3 F.3d 563, 565 (2d Cir.1993). A treating physician's opinion on the nature and severity of an individual's impairment will be given controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the claim file. 20 C.F.R. § 404.1527(d)(2). If the treating physician's opinion is not given controlling weight, a district court should apply the following factors to determine the weight to be given to the opinion: "(i) the

frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." 20 C.F.R. § 404.1527(d)(2)–(6); *see Schaal v. Apfel,* 134 F.3d 496, 503–04 (2d Cir.1998).

Even if plaintiff's treating physicians' opinions are not entitled to controlling weight, we find that they are entitled to substantial weight based on the application of the above factors. With respect to Dr. Todd, plaintiff had been a patient of his for approximately eight and one-half years when plaintiff applied for disability benefits. As a specialist in vascular surgery, Dr. Todd operated on plaintiff several times to repair multiple aneurysms. He opined that "[i]t is my judgement that he is disabled because of his unusual propensity for aneurysm formation, the result of his multiple surgical procedures in the past, and as a result of his risk for stress related aneurysm rupture." Claim File, Hartz Aff.Ex. 2, at 236.

In addition to Dr. Todd's plaintiff's other two treating physicians agreed that plaintiff has a propensity for multiple aneurysm formation which is exacerbated by stress. They found that if he continued to work, there would be a risk that he would develop more aneurysms which could rupture. Dr. Schwartz stated on December 20, 1996 that "Mr. Durr's problem has continued to recur and in my best judgement is likely exacerbated by other physical or emotional stress associated with continued employment; and therefore, it is my opinion he is unable to work." *Id.* at 212. On January 7, 1997, Dr. Cretella similarly opined that "[d]ue to his illness, he is unable to work as an Account Representative. Sedentary jobs are also unacceptable if·associated with stress, as they may raise BP and cause aneurismal rupture. He has an arterial aneurism, right groin." *Id.*

---

**2.** Although the standards developed under the Social Security Act are not binding in ERISA cases, they are nonetheless instructive. *See Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 695 n.

11 (7th Cir.1992); *Torix v. Ball Corp.,* 862 F.2d 1428, 1431 & n. 6 (10th Cir.1988); *Helms v. Monsanto Co.,* 728 F.2d 1416, 1420–21 & n. 6 (11th Cir.1984).

As mentioned earlier, defendant does not dispute any opinion on the diagnosis of plaintiff's condition. Rather, defendant contends that plaintiff has not provided sufficient evidence demonstrating that work-related stress could contribute to plaintiff's condition. The claim file, however, does not support defendant's position. Specifically, the claim file does not contain any evidence showing that plaintiff is not disabled. Nor is there any evidence demonstrating that stress would not cause plaintiff to develop aneurysms or that stress would not prohibit plaintiff from performing his job duties. *See Rizk*, 862 F.Supp. at 791–92 (finding that it was arbitrary and capricious to deny long-term disability benefits where no evidence in the record supported the administrator's position). Based on the consistent opinions of Drs. Todd, Schwartz, and Cretella, on the one hand, and defendant's position—which lacks support in the claim file and which was based on Dr. Petrie's opinion (which we found was based on assumptions inconsistent with the SPD's requirements), on the other hand, we find that it was arbitrary and capricious for defendant to rely on Dr. Petrie's opinion to the exclusion of plaintiff's treating physicians' opinions. *See Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir.1996) (finding that "where the reviewing physician's conclusions are contradicted by an examining physician and two treating physicians, reliance on the reviewing physician's conclusions 'seems especially misplaced' and constitutes an abuse of discretion").

## *CONCLUSION*

For the foregoing reasons, we DENY defendant's motion for summary judgment and *sua sponte* GRANT summary judgment in plaintiff's favor. Because the denial of benefits was arbitrary and capricious, it is not necessary to remand plaintiff's claim to Met-Life for reconsideration. *See Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 51 n. 4 (2d Cir.1996) (stating that a district court is not required to remand the case to the plan administrator if it would be a useless formality).

Thus, we reverse MetLife's findings as the claims administrator and fiduciary and order defendant to provide temporary disability benefits to plaintiff. While plaintiff is entitled to temporary disability benefits for twenty-seven weeks (four of compensation continuance and twenty-three of temporary disability), he has already received one week of compensation continuance benefits for the period from August 30, 1996 to September 6, 1996. Thus, plaintiff is entitled to temporary disability benefits for a total of twenty-six weeks (three of compensation continuance and twenty-three of temporary disability), calculated as follows.

According to plaintiff's Notice of Disability dated October 8, 1996, plaintiff's average weekly income was $385.54. Claim File, Hartz Aff.Ex. 2, at 1. For the period beginning September 7, 1996, plaintiff is entitled no three weeks of compensation continuance benefits, through September 27, 1996, at 100% of his pay, or $1156.62. For the next twenty-three week period, plaintiff is entitled to temporary disability benefits at 80% of his average salary, because he had been employed by MetLife for over ten years. *See* SPD, Hartz Aff.Ex. 1, at STD–14. Thus, during this period, plaintiff is entitled to receive twenty-three weeks of pay at the rate of $308.43 per week, or $7093.89. *See* Claim File, Hartz Aff .Ex. 2, at 1. Therefore, defendant is directed to pay plaintiff $8250.51 in weekly disability benefits.

At this time, we decline to award plaintiff long-term disability benefits because plaintiff did not reach the point of being eligible for such benefits by exhausting his temporary disability benefits. Plaintiff may now file an application for long-term disability benefits with MetLife. Usually, an employee must submit a claim for long-term disability benefits no later than six months after the disabling condition began. SPD, Hartz Aff.Ex. 1, at OI–61. (According to plaintiff, he was last able to work on August 30, 1996 such that he should have filed a claim for long-term disability benefits by the end of February 1997.) At that time, however, his claim for temporary disability, benefits was still pending. Consequently, we order defendant to accept and process plaintiff's application, if it is filed.

The Clerk of the Court is directed to enter judgment in plaintiff's favor.

**SO ORDERED.**