USCA1 Opinion

 

 August 26, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1142 RESOLUTION TRUST CORPORATION, Plaintiff, Appellee, v. JERALD R. FELDMAN, ET AL., Defendants, Appellants. ____________________ ERRATA SHEET The opinion of the Court issued on August 20, 1993, is amended as follows: On page 3, line 8, delete "in exchange" so that line reads as follows: "exchanged its secured position for an unsecured". _________ UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1142 RESOLUTION TRUST CORPORATION, Plaintiff, Appellee, v. JERALD R. FELDMAN, ET AL., Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ J. Daniel Lindley with whom Peter Antell and Antell & Associates _________________ _____________ ____________________ were on brief for appellants. James H. Wexler with whom Bennett H. Klein and Kotin, Crabtree & ________________ _________________ _________________ Strong were on brief for appellee. ______ ____________________ August 20, 1993 ____________________ BOUDIN, Circuit Judge. In this appeal we revisit a suit _____________ brought by the Resolution Trust Company ("RTC"), as receiver for a failed bank, to collect on a promissory note given the bank by Quinaquisset Realty Trust ("Quinaquisset"). In the first round we affirmed the district court's dismissal of Quinaquisset's claims against a third party. Resolution Trust ________________ Corp. v. Driscoll, 985 F.2d 44 (1st Cir. 1993). We now _____ ________ affirm the district court's entry of summary judgment for the RTC in its action against Quinaquisset and its rejection of Quinaquisset's counterclaims against the RTC as receiver. In October 1987, Fox Run Realty Trust ("Fox Run") conveyed to Quinaquisset certain condominium rights in a property called Willowbend that Fox Run was then developing. Quinaquisset was given these rights because it had contributed land to the development. In a contemporaneous transaction, Fox Run then repurchased the condominium rights, giving Quinaquisset a $1.1 million promissory note as part payment with the balance paid in cash. Then, in April 1989, Quinaquisset borrowed $950,000 from Sentry Federal Savings Bank ("Sentry"), giving it in exchange a $950,000 promissory note which is the subject of this case. A number of individuals signed a guaranty of this new note, and Quinaquisset gave Sentry the $1.1 million Fox Run- Quinaquisset note as collateral for the new note. -2- -2- Fox Run was also indebted to Sentry, having obtained in December 1986 a $13 million loan from Sentry to finance Willowbend. In return for this loan, Sentry took back a promissory note secured by a mortgage on Willowbend. Sentry's mortgage was initially subordinated as to 152 acres of Willowbend on which Quinaquisset then held a first mortgage, but Quinaquisset released its mortgage in October 1987 when it received the condominium permit rights subsequently repurchased by Fox Run. No one has ever explained why Quinaquisset exchanged its secured position exchanged its secured position for an unsecured claim of $1.1 _________ million against Fox Run, but the consequences were evident when Fox Run encountered financial difficulties. In August 1989, Fox Run fell into default on its payments to Quinaquisset. The next month, Fox Run halted payments on its $13 million debt to Sentry. Quinaquisset had been using the payments received from Fox Run on the $1.1 million note to cover Quinaquisset's payments to Sentry on the $950,000 note. When Fox Run ceased to pay Quinaquisset, Quinaquisset in turn fell into default on its own $950,000 note to Sentry. In April 1990 Fox Run and Sentry entered into a settlement agreement under which Sentry received title to Willowbend in return for its promise not to proceed under the $13 million note against two individuals who had guaranteed Fox Run's payments to Sentry. Sentry retained its -3- -3- mortgage on Willowbend, and in a subsequent foreclosure sale the property was acquired by the Evergreen Holding Company ("Evergreen"), a wholly owned subsidiary of Sentry. In May 1990, Sentry, seeking to recover the balance of the $950,000 note from Quinaquisset, brought suit in state court against Quinaquisset's trustee and the individual guarantors of the note. In September 1990, Sentry itself failed. The RTC stepped in as its receiver, and removed Sentry's pending state court suit against Quinaquisset's trustee and the guarantors to federal district court. In the district court, Quinaquisset asserted numerous claims of its own against the RTC as successor to Sentry, against Evergreen, and against Fox Run's trustees. It also asserted that the alleged misconduct of these entities rendered the Quinaquisset-Sentry note null and void. Quinaquisset's claims against Evergreen were dismissed on a motion for summary judgment. On May 12, 1992, the district court entered separate judgment for Evergreen pursuant to Fed. R. Civ. P. 54(b), and we affirmed on appeal. Driscoll, ________ 985 F.2d at 45. Prior to its entry of judgment for Evergreen, the district court had on July 19, 1991, granted summary judgment for the RTC on its claims against Quinaquisset. The court found all but one of Quinaquisset's counterclaims to be barred by the D'Oench, Duhme doctrine, codified as 12 U.S.C. ______________ -4- -4- 1823(e), which limits claims based on agreements or understandings not reflected in bank records. See D'Oench, ___ ________ Duhme Co. v. FDIC, 315 U.S. 447 (1942). The remaining claim __________ ____ against the RTC was dismissed on other grounds and no appeal has been taken as to it. On November 13, 1992, the district court entered separate judgment for the RTC under Fed. R. Civ. P. 54(b). The judgment included an award of attorneys' fees and costs to RTC. This appeal followed. In this court, Quinaquisset challenges the Rule 54(b) certification, but instead of offering a coherent explanation of why judgment for the RTC should have been delayed, Quinaquisset attacks the attorneys' fee award. The district court evidently entered a separate judgment for the RTC because all claims between Quinaquisset and the RTC had been resolved; the remaining claims by Quinaquisset against the Fox Run trustees, in federal court solely on pendant jurisdiction, were remanded to the state court. We conclude that the judgment is properly before us.1 Turning to the merits, Quinaquisset contends that the district court's reliance on D'Oench, Duhme to dispose of its ______________ claims against the RTC as Sentry's receiver is mistaken. It says that its claims against the RTC are not based on any ____________________ 1The certificate may have been unnecessary. Because the district court added a paragraph to the judgment remanding the claims against the Fox Run trustees to state court, apparently the judgment disposed of all remaining claims in the federal court suit. -5- -5- agreement, hidden or otherwise, between itself and Sentry, but rather on Sentry's foreclosure and sale of Willowbend. Quinaquisset argues that Sentry's settlement with Fox Run in April 1990, and its subsequent foreclosure on Fox Run's principal asset, Willowbend, destroyed the value of the $1.1 million Fox Run-Quinaquisset note deposited with the bank as collateral for Quinaquisset's own debt, and that this impairment of collateral in turn served to discharge Quinaquisset's debt to Sentry. This legal theory represents a substantial winnowing of Quinaquisset's claims made in the district court. There, Quinaquisset alleged that Sentry engaged in wrongful conduct not only at the foreclosure stage but also earlier, e.g., ____ with respect to Quinaquisset's October 1987 discharge of its mortgage on part of Willowbend and its reconveyance of condominium permit rights to Fox Run. Quinaquisset also made claims, likely foreclosed by D'Oench, Duhme, suggesting that ______________ Sentry had privately promised to assure that Fox Run would repay Quinaquisset the $1.1 million. In fairness to the district court, it has often been difficult among the welter of claims to be sure what Quinaquisset was actually arguing at various points. Nor does the RTC help matters when it presses, as usual, a reading of D'Oench, Duhme so broad that one is reminded of ______________ sovereign immunity claims made by independent nations. In -6- -6- any event, whether to avoid D'Oench, Duhme or for some other ______________ reason, Quinaquisset has now reduced its legal position to a single claim (against the RTC) and defense (against the RTC's own suit) based on the impairment of the value of the $1.1 million note given to Sentry as collateral for the Quinaquisset note. This streamlined position may help Quinaquisset to avoid application of the D'Oench, Duhme _______________ doctrine--although the RTC claims that the doctrine applies anyway--but the strategy raises its own problem: the lack of any legitimate theory of liability. The gist of what happened, in relation to the foreclosure, was that Sentry held the mortgage on Willowbend to secure the $13 million loan to Fox Run, Fox Run stopped paying, and Sentry then foreclosed the mortgage and applied the proceeds to the debt.2 This left Quinaquisset's $950,000 note to Sentry still unpaid and the RTC proceeded with Sentry's prior suit to collect. These circumstances provide scant basis for a claim against Sentry or the RTC, or a defense against collection of the unpaid note. Quinaquisset relies centrally on section 3-606 of the Massachusetts Commercial Code, Mass. Gen. L. ch. 106, 3- ____________________ 2As noted, Sentry also received a conveyance of title from Fox Run, and Sentry in exchange released two individuals who had guaranteed payment of the Fox Run-Sentry note. This conveyance was subject to the mortgage, but presumably assured that Fox Run would not challenge the foreclosure. -7- -7- 606. That section, titled "Impairment of Resource or of Collateral," states in pertinent part: (1) The holder [of an instrument] discharges any party to the instrument to the extent that without such party's consent the holder (a) without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person, except that failure or delay in effecting any required presentment, protest, or notice of dishonor with respect to any such person does not discharge any party as to whom presentment, protest, or notice of dishonor is effective or unnecessary; or (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse. Although invoked by Quinaquisset, subsection (1)(a) does not by any stretch of the imagination apply in this case. With respect to the Quinaquisset-Sentry note--the subject of this suit--Sentry never purported to release anyone from, nor promised not to sue anyone under, this note. The only releases issued by Sentry had nothing to do with the Quinaquisset-Sentry note: they were releases of the individual guarantors of Fox Run's debt to Sentry, a debt for which Quinaquisset was not responsible since it was never a party to nor a guarantor of the Fox Run-Sentry note. Turning to subsection (1)(b), Quinaquisset argues that Sentry divested Fox Run of Willowbend by the transfer of -8- -8- title from Fox Run followed by the mortgage foreclosure. This in turn, says Quinaquisset, meant that Fox Run's principal asset was no longer available to Quinaquisset to back up Fox Run's debt to Quinaquisset. This is quite true, although somewhat misleading.3 It might also be said that, in some sense, Sentry's actions "impaired" the "collateral for the instrument," if collateral is taken to be the Fox Run-Quinaquisset note which Sentry held to secure the Quinaquisset-Sentry note and that latter note is called "the instrument." But subsection (1)(b) requires that the impairment be "unjustifiabl[e]" and we think it absurd to argue, as Quinaquisset does without a shred of authority, that it was unjustifiable for Sentry to foreclose on property for which it held the mortgage when a default occurred on the secured debt. That is just what security is there for. The fact that this security was an asset of a party, Fox Run, who also had a debt to Quinaquisset meant that Quinaquisset was made worse off by the foreclosure. That is the normal fate of unsecured creditors when the bankrupt's only asset is already pledged. ____________________ 3It is misleading because Willowbend was not much of an asset, even in Fox Run's hands, so long as it was subject to a mortgage to secure a defaulted debt apparently as large or larger than the value of Willowbend. -9- -9- Quinaquisset might have been better off if Sentry had pursued Fox Run's guarantors instead of looking to Willowbend to satisfy Fox Run's debt, but the guarantees were to Sentry and the mortgage ran to Sentry. Sentry's decision to forgo its claims against the Fox Run guarantors in favor of a trouble-free sale of the property was an entirely reasonable choice which was Sentry's to make. Sentry is not responsible for Quinaquisset's dilemma; if Quinaquisset's claim against Fox Run is illusory, it has no one but itself (and possibly Fox Run) to blame. Since Quinaquisset has failed to set forth a cause of action or defense against Sentry under section 3-606 (and, thus, against the RTC as receiver), we sustain the district court on that ground. See Doe v. Anrig, 728 F.2d 30, 32 (1st ___ ___ _____ Cir. 1984) (court may affirm on a ground not relied on by the district court). We need not address the RTC's numerous other arguments as to why section 3-606 should not apply. Other versions of Quinaquisset's claims against Sentry made in the district court may properly have been dismissed on grounds of D'Oench, Duhme, but since these versions have not ______________ been argued in this court, we have no occasion to consider them.4 ____________________ 4Quinaquisset also complains that Sentry, and then the RTC, declined to surrender the Fox Run-Quinaquisset note after the foreclosure so that Quinaquisset could pursue its rights under the note. But (assuming the note still had value after the foreclosure), the note remained security for -10- -10- The final issue is the district court's award of attorneys' fees to the RTC. Under the terms of the guaranty supporting Quinaquisset's note to Sentry, the individual guarantors agreed not only to guarantee the Quinaquisset debt but to pay all costs and attorneys' fees incurred by Sentry "in connection with the enforcement of . . . [Sentry's] rights under, this Guaranty." The district court awarded the RTC $79,374 in legal fees for the district court suit, and it held that the guarantors were jointly and severally liable for this amount. Quinaquisset objects to the portion of the award attributable to the Evergreen phase of the litigation. It argues that the claims against Evergreen were not within the scope of the guaranty and that the request for such fees is in any event untimely because it was made well after the separate judgment in favor of Evergreen. We consider the scope issue first. On the issue of interpretation of the guaranty, our review is plenary; neither side relies on anything other than the language of the guaranty, which extends to "all" costs and attorneys' fees of Sentry "in connection with" the enforcement of Sentry's rights under the guaranty. ____________________ Quinaquisset's debt to Sentry; Sentry says, as one might expect, that the conditions for returning the note had not been satisfied; and Quinaquisset offers no reply. -11- -11- Although this suit began with Sentry's efforts to collect against the Quinaquisset guarantors, Quinaquisset then asserted separate third-party claims against Evergreen. The only colorable claim against Evergreen was an attempt to undo the foreclosure of Sentry's mortgage on Willowbend. Driscoll, 985 F.2d at 47. We agree that it might be too much ________ of a stretch of the "in connection with" language to treat this phase of the litigation--if there were nothing more to Evergreen's involvement--as any part of the enforcement of Sentry's rights under the Quinaquisset-Sentry note. But there was more to Evergreen's involvement. In the answer to Sentry's complaint Quinaquisset asserted that the conduct of Sentry's subsidiary or affiliate, i.e., Evergreen, ____ was a defense to Sentry's suit against the guarantors on the Quinaquisset-Sentry note; and in the third-party complaint against Evergreen, Quinaquisset said that the conduct of various entities including Evergreen made the note null and void. While this claim or defense as to Evergreen evaporated under scrutiny, the allegations made it essential for the RTC to defend Evergreen as part of Sentry's own collection suit against the guarantors. As for timeliness, Quinaquisset's objection rests on a decision of this court, White v. New Hampshire Dep't of _____ ________________________ Employment Security, 629 F.2d 697 (1st Cir. 1980). There, ___________________ this court held that a motion for attorneys' fees under 42 -12- -12- U.S.C. 1988 came too late when made over four months after entry of a final judgment adopting a consent decree and apparently ending active litigation in the case. Quinaquisset fails to mention that the decision was reversed over a decade ago by the Supreme Court on the very point at issue. 455 U.S. 445 (1982). In any event, there was no untimeliness here even under our original decision in White, _____ so the objection is doubly without merit. Attorneys' fees were not sought until after the separate judgment in favor of Evergreen but Evergreen itself had no claim to attorneys' fees. Rather, the guaranty ran in favor of Sentry, now the RTC as receiver. The RTC did seek attorneys' fees for all its work, including the defense of Evergreen's actions, before a final judgment was entered in its favor. Lastly, we affirm the district court's decision that each guarantor is individually responsible for the full amount of attorneys' fees. Quinaquisset argues that the attorneys' fee should have been apportioned among guarantors, just as liability for the underlying debt was apportioned; the guaranty made each guarantor liable for only $150,000 (or $75,000 in a few cases) of the underlying $950,000 debt, as provided in a schedule attached to the guarantee. The short answer is that liability for costs and attorneys' fees rests on a different provision of the guaranty that made the -13- -13- "Guarantors" liable for such costs and fees without limitation. A promise cast in these terms normally makes each person liable for the full sum, whether the liability is described as joint, several, or both. 4 A. Corbin, Contracts 928 _________ (1951). Distinctions among those concepts (joint, several, joint and several) relate to other matters, such as joinder and release, not to the amount of liability. The amount of liability can be contractually limited by specifying that the ___ promisors are liable only for specific amounts, Corbin, ______ supra, 925, at 703-04, but in this case no such limitation _____ was attached to the promise to pay collection costs and attorneys' fees. The judgment of the district court is affirmed. ________ -14- -14-