Benjamin Dizoglio v. Digital Equip.   CV-98-402-B   07/23/99

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Benjamin Dizoglio**</u>

   v.                                    Civil No. 98-402-B

<u>**The Digital Equipment Corporation
Disability Income Protection Plan**</u>

<u>**MEMORANDUM AND ORDER**</u>

     Benjamin Dizoglio brings an action pursuant to 29 U.S.C. §
1132(a)(1)(B) to recover benefits allegedly due to him under the
terms of the Digital Equipment Corporation Disability Income
Protection Plan (the "Plan").  The Plan has moved for summary
judgment pursuant to Fed. R. Civ. P. 56(b), claiming that its
denial of Dizoglio's claim was not arbitrary and capricious, an
abuse of discretion, or otherwise not in accordance with the law.
Dizoglio objects to the Plan's motion and instead argues that I
should grant summary judgment in his favor.  For the reasons set
forth below, I deny defendant's motion for summary judgment,
partially grant plaintiff's motion for summary judgment, and
remand the case to the Plan Administrator for further proceedings
consistent with the terms of this order.

## I.  FACTS

Dizoglio joined Digital as a stockkeeper at its Nashua, New Hampshire, facility in April 1986.  In December 1991, he was promoted to Senior Logistics Associate.  Dizoglio's two positions with Digital were very similar, requiring him to operate a forklift, to lift, carry, and move stock weighing up to 100 pounds, and to spend approximately two hours each day running reports at a computer terminal.  See Pl.'s Am. Compl. at ¶ 7.

In June 1992, Dizoglio struck the right frontal region of his head against an overhanging cabinet in his home, suffering a laceration and numbness on the right side of his face, dizziness, and a loss of balance.  See id. at ¶ 8.  Dizoglio attempted to continue working, but over the course of the following year, he began to experience progressive abnormalities, including persistent numbness in his extremities and the left side of his abdomen, double vision, fatigue, memory impairment, difficulty thinking, and continued dizziness and loss of balance.  See id. at ¶ 9.

### A.  Dizoglio's Medical History

Dizoglio began to seek treatment for his ailments shortly after the incident.  A cranial CT scan taken on July 16, 1992,

was normal, see Aff. of Kiernan, § G, p. 8. A neurological examination by Dr. Daniel Botsford also found no abnormalities. In light of these findings, Dr. Botsford recommended no further testing. See id. at 9-10. Nevertheless, Dizoglio visited Dr. Botsford five more times, on August 18, September 29, October 13, October 28, and December 9, 1992, repeatedly presenting with numbness in his chest and difficulties with coordination. Dr. Botsford's reports from those visits, examinations, and follow-up testing show that he was unable to identify the cause of Dizoglio's symptoms. See id. at 12-26. On December 9, 1992, Dr. Botsford noted that Dizoglio was moving "full speed ahead at work," that this "is not an unreasonable ultimate disposition in the absence of a diagnosis," and that "it probably makes most sense to support him in his return to work and refrain from rocking the boat." Id. at 24.

In August 1993, Dizoglio's personal physician, Dr. Mark Timmerman again referred Dizoglio to Dr. Botsford for dizziness, numbness, and an inability to concentrate. Dr. Botsford recommended psychometric testing, thyroid function testing, a Prozac level test, a sleep study, and a repeat MRI if no diagnosis was produced by the aforementioned tests. See id. at 42. Dr. W. David Brown conducted the sleep study in August 1993,

finding significant sleep apnea and a "poor" sleep efficiency of 76 percent. Dr. Brown recommended that Dizoglio use a CPAP mask while sleeping and reduce or discontinue using Prozac. See id. at 48-52.

In September 1993, Dr. Joan Scanlon completed a neuropsychological examination of Dizoglio, finding mild to moderate impaired ability to discriminate between relevant and irrelevant detail, below average visual sequencing, difficulty with visual spacial skills, particularly on the left side, and some impairment of bilateral memory. All other tests, including tests of attention, language ability, and normal memory were unremarkable. Dr. Scanlon noted that Dizoglio demonstrated

> definite tendencies to exhibit somatic complaints without sufficient organic basis. Individuals with his profile may present with headaches, fatigue, weakness, pain, and a variety of musculoskeletal complaints, as well as more atypical presentations such as amnesia, blurred vision, dizziness, and other symptoms symbolizing an inability to face his present world. . . . presently, a clear differentiation of functional versus organic contributions to his difficulties is an essentially impossible task. However, he is prone to accept the patient role quite readily, as it alleviates him of responsibilities which have become increasingly burdensome to him.

Id. at 62. Dr. Scanlon recommended counseling, stress management, and treatment with antidepressants. See id. at 62-64.

In September and October 1993, optometrist Dr. Elliot F. Lasky examined Dizoglio, noting that his initial eye examination was "within normal limits," but that the results of a threshold visual field examination, to help determine the integrity of the visual and neurological systems, showed "Incongruous Homonymous Hemianopsia, with a more defined Scotoma in the right eye." Id. at 66. Dr. Lasky concluded that "the results suggest a post chiasmal lesion" but he suggested a further neurological evaluation by a neuro-opthalmologist to confirm his suspicions. Id.

On October 15, 1993, neuro-opthalmologist Dr. Thomas R. Hedges III performed a neurological eye examination on Dizoglio, and found "very little, if anything, in the way of objective findings to explain Mr. Dizoglio's symptoms." Id. at 71. He recommended gathering more objective data through a visual-evoked response test performed by a neurologist. See id. Dr. Botsford performed this visual-evoked response test in November 1993, with normal results. See id. at 77.

Meanwhile, Dr. Brown performed a follow-up sleep test in October 1993 and determined that the nasal CPAP he prescribed in August had significantly improved Dizoglio's sleep-related difficulties. See id. at 67-69. A sinus rhythm test performed

at Dr. Timmerman's request was also normal.  See id. at 75.

On December 20, 1993, Dizoglio presented to Dr. Timmerman complaining of extreme dizziness that had allegedly caused him to drive his car off the road and to fall out of his chair at work. Dr. Timmerman referred Dizoglio to another neurologist, Dr. Khawaja M. Rahman.  See id. at 81-84.  At this time, Dizoglio's condition allegedly worsened to the point that he was no longer able to perform the essential duties of his position, and he ceased active employment at Digital on December 30, 1993.  See Pl.'s Am. Compl. at ¶ 12.  The Plan immediately began providing him disability benefits.

Dr. Rahman reviewed Dizoglio's medical records, took a medical history, and performed an examination on March 23, 1994, finding "no definite abnormality" after "very extensive diagnostic workup."  Dr. Rahman recommended an electronstagnogram to determine the cause of Dizoglio's dizziness, and a cervical MRI to rule out cervical disc disease.  He concluded,

> I am not convinced after reviewing the records and his history that he has MS.  I think most likely we are dealing with post traumatic peripheral vestibular dysfunction with benign positional vertigo along with closed head injury (post traumatic syndrome).  There is [sic] question that when he sustained the head injury he might have sustained cervical injury also, probable cervical disc disease resulting in paresthesias and numbness in the C8 distribution of both upper extremities.

Aff. of Kiernan § G, p. 103. On April 11, 1994, however, Dr. Rahman found a cervical spine MRI on Dizoglio unremarkable except for a small bony spur at D1-D2. See id. at 105. Dr. Rahman continued to speculate that Dizoglio's dizziness, decreased concentration, and short term memory problems were the result of closed head injury with post traumatic concussion syndrome, and referred Dizoglio back to Dr. Scanlon for a neuropsychological reevaluation to attempt to confirm this speculative diagnosis. See id.

Dr. Scanlon reevaluated Dizoglio on May 5, 1994, and noted that during his office visit, Dizoglio no longer relied on a cane for balance and did not appear to be depressed or to lose his train of thought. See id. at 106. According to Dr. Scanlon's Diagnostic Summary and Recommendations,

> treatment for his depression and sleep disorder has provided a less complicated picture underlying his cognitive difficulties, and indeed, improvement in these areas is the likely basis for the variety of areas of improved functioning identified in the present evaluation. . . . Mr Dizoglio is manifesting improved memory skills although visual memory continues to be an area of weakness, greater motor control, improved ability to inhibit competing responses, and an improved ability to retain visual details. However, certain visual-spatial difficulties remain distinctly impaired, is certainly inconsistent with his history as an athlete [sic], and in all likelihood exists on the basis of his head injury.

Id. at 109-110. On the basis of these findings, Dr. Scanlon

concluded,

> I believe Mr. Dizoglio is quite an appropriate
> candidate for rehabilitative therapies. . . . the
> present test results do not suggest any cognitive
> difficulties should he return to work, as his position
> substantially involves the use of verbal skills and the
> retention of details, where he exhibits entirely
> adequate functioning.

Id. at 110.

On the basis of Dr. Scanlon's recommendation, Dizoglio underwent occupational rehabilitation therapy between May 31, 1994 and July 26, 1994. During this therapy, he was referred to optometrist Dr. Kevin Chauvette, who performed a comprehensive binocular vision evaluation and determined that Dizoglio's eyes were healthy and free from disease. Dr. Chauvette noticed, however, that Dizoglio had a marked reduction in the peripheral vision in his right eye, difficulty using his eyes together to track a moving target, and that he became dizzy when he tried to do so. He also found a moderate exophoria[1] and a large hyperphoria[2] and concluded that, while this muscle imbalance might not be the sole cause of Dizoglio's dizziness, the eye strain it causes might be a contributing factor. He recommended

_____

[1] A condition where the eyes tend to turn outward. See Aff. of Kiernan § G, p. 131.

[2] Condition where the left eye pulls downward. See Aff. of Kiernan § G, p. 131.

-8-

corrective lenses.  See id. at 131.

On July 1, 1994, Dizoglio became eligible for long-term disability benefits, having been continuously absent from work for a period of 26 weeks.  He continued in rehabilitative therapy, and at the conclusion of 23 sessions, Dizoglio's therapist, Donna Sweeney, "strongly recommend[ed]" that Dizoglio return to work for a six week transition/trial period.  Id. at 128.  Dizoglio alleges that at that time, he made several attempts to contact managers at Digital to establish a start date, but due to the pending merger, his calls were not immediately returned.  See id. at 126.

Although out of work on disability for nine months at this point, Dizoglio reported to Dr. Timmerman in a September 1994 appointment that he was "doing activities to the extent that he [could]" including fishing, playing softball, and playing golf. See id. at 149-55, 179.  Despite the recommendations of his neuropsychologist and his physical therapist, however, Dizoglio did not return to work.

In June 1995, Dizoglio presented to neurologist Dr. James Whitlock, Jr., with the same symptoms.  Dr. Whitlock examined Dizoglio's medical history, independently tested Dizoglio, and concluded that Dizoglio was

likely symptomatic from anxiety disorder, somatization disorder, or a combination of both. I do not think that the difficulty has its basis in either the inner ear or the part of the central nervous system associated with equilibrium or vestibular function.

Id. at 142-43. Dr. Whitlock, however, requested the opportunity to review Dizoglio's test results from the past several years, including his MRI scans and his polysomnography report, before making a final diagnosis.

Dr. Whitlock re-examined Dizoglio in July 1995, in light of the additional information, and concluded that "there was a significant emotional component to the symptomatology that was being experienced" and that "the services of the right psychologist could be very helpful." Id. at 170. Nevertheless, Dr. Whitlock did recommend one additional physiological test, involving a sleep-deprived EEG, to rule out the possibility of paroxysmal disorder, and noted that, "[i]f there is no paroxysmal activity seen, I am afraid that I have little more to add." He then noted that

[i]f the most thorough search possible for an underlying organic basis for balance disorder is desired, I would suggest a referral to Jules Friedman M.D. . . . [who] has been operating a very advanced vestibular laboratory . . . for over a decade and has been very helpful in documenting the physiologic basis (or lack thereof) of complaints related to equilibrium. He has access to measurement apparatus that is very hard to come by elsewhere in the country.

Id. at 170.

Later that month, Dr. Rahman performed the sleep-deprived EEG to test for paroxysmal disorder, reported that Dizoglio's results were normal, and ruled out such a diagnosis. See id. at 175.

In November 1995, pursuant to Dr. Timmerman's recommendation, the Claims Administrator for Dizoglio's insurance company asked Dr. Friedman to perform an independent medical evaluation to determine the nature of Dizoglio's repeated equilibrium-related complaints. See id. at 185. Only a month later, Dizoglio told Dr. Timmerman that he had driven to Florida on vacation, and had "[made] allowances [for his disability] by placing two hands on the wheel." Id. at 186.

That same month, however, Dr. Timmerman completed a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" form, stating that Dizoglio claimed that his ability to lift and carry were affected by his impairment, that his dizziness precluded his ability to sit, stand, or walk, that he could occasionally climb, crouch, stoop, and kneel, but could not balance, and that his ability to reach, hear, and speak were not affected by his condition, but his peripheral vision was limited, his sense of feeling was affected, and he dropped things

-11-

unexpectedly and became dizzy when he performed pushing or pulling activities. Finally, Dr. Timmerman noted that Dizoglio could not be exposed to heights, work with moving machinery, experience heat and humidity, noise, fumes, or vibration, or stare at a computer or fluorescent lights without exacerbating his dizziness and nausea. See id. at 187-91. Dr. Timmerman admits, however, that no functional assessments were conducted prior to drawing these conclusions, and that these assessments were based solely on his observations and Dizoglio's representations. Dizoglio remained out of work, and continued to collect benefits.

On November 8, 1996, the Metropolitan Life Insurance Company ("MetLife"), which provided administrative services for Digital under the Plan, wrote to Dr. Timmerman to inquire whether Dizoglio had ever been sent to Dr. Friedman for further vestibular testing. MetLife asked Dr. Timmerman to either produce the results of that testing or to provide a status update and specifically identify "what is presently preventing [Dizoglio] from working." Id. at 205. Dr. Timmerman referred Dizoglio to Dr. Friedman on February 16, 1997, and forwarded his medical history, noting that Dizoglio was "believed" to have closed head injury syndrome that his records indicate "an

inconsistent multiplicity of complaints." Id. at 216-17.

Dr. Friedman reviewed Dizoglio's entire medical history and conducted an independent battery of vestibular tests on February 18, 1997. According to Dr. Friedman,

> we today performed full field optokinetic testing and it was quite normal. I am certain that the findings on electronystagmography were an artifact of attention which is so commonly the case with that limited study . . . I would further venture that there are significant inconsistencies in the patient's observed pattern of dysequilibrium. . . during portions of the examination for balance, the patient appeared to be more stable in situations that were more difficult than those in which he was less stable. I must strongly suspect a significant functional component to the patient's observed dysequilibrium. . . .

Id. at 220. Dr. Friedman concluded,

> I can state with certainty that there is no evidence that Mr. Dizoglio has central or peripheral vestibular dysfunction as a source of his symptoms. I am further convinced, at the very least, there is a significant component of embellishment of his observed dysequilibrium which was the one element of this examination and assessment which was abnormal. In considering his entire clinical course, I would further state that I would be hard pressed to define a particular etiology which would explain this pattern, frequency, and duration of symptoms. Taking all this into consideration, I must agree that there is no consistent evidence that these symptoms are anything other than the manifestations of a functional disorder. I state this recognizing that in all such cases there may be a small nucleus of organicity which is being embellished for whatever reason. Certainly, however, no effort has been spared over the years to try to document this elusive pathology and nothing has been forthcoming. . . . I trust the results of today's work up will be helpful as perhaps one of the last pieces of

-13-

the puzzle.
Id. at 218.

On April 18, 1997, Dr. Timmerman wrote to Met Life, noting that "[t]he workup for possible physical (or organic) causes of Ben's continuation of symptoms has been unable to prove a causal relationship." Id. at 225. He also referred Dizoglio back to Dr. Scanlon for a third evaluation, this time to assess Dizoglio's cognitive and psychological functioning with a focus on the question of possible malingering or symptom exaggeration. Dr. Scanlon concluded that Dizoglio's "present symptoms are largely maintained due to psychological factors as was discerned in Dr. Freedman's [sic] examination," noted that Dizoglio's psychological profile contains the classic "conversion V," depicting the conversion of psychological concerns into somatic complaints, and that Dizoglio's attentional variability could be attributed to depression rather than any organic factor. Although Dr. Scanlon noted that Dizoglio's continued difficulty with visual-spatial skills would preclude him from operating a forklift, he noted that Dizoglio was not precluded from resuming another position, and that "his involvement in vocational activities is imperative in terms of curtailing his psychological difficulties and re-establishing his sense of competency." Id.

-14-

at 233.

Despite these findings, on August 13, 1997, after his ERISA benefits had been revoked by Met Life and denied on a first-level appeal, Dizoglio submitted to the Claims Committee a Physical Capacities Evaluation ("PCE") completed by Dr. Timmerman. The PCE advocated the nearly total restriction of Dizoglio's work activities, concluding that Dizoglio "feels incapable of functioning in a daily workforce at this time. His lifting, carrying, pulling & grasping are all at the risk of dropping objects. His 60 lb. weight gain, he believes, impairs all activities. His balance impairs most walking and driving activities." Id. at 238-40. The record does not suggest that any clinical testing was relied on in reaching these conclusions.

## B. **The Plan**

The Plan is an uninsured employee benefits plan funded both by Digital and its employees. See Aff. of Kiernan at Ex. 2 (§§ 4.1, 4.2, 5.1, and Appendix B at § 7(c)). The version of the Plan relevant to this complaint, the November 22, 1993, Restatement (Ex. 2), is authorized pursuant to the Digital Equipment Corporation Employee Benefits Master Plan ("Master Plan"), see Aff. of Kiernan at ¶ 8 and Ex. 1, and is sponsored and administered by Digital. See Compl. at ¶ 4. The Plan

provides shorter- and longer-term disability benefits to eligible participants.  See Aff. of Kiernan at ¶ 8.

Section 2.1 of the Plan provides that Digital employees are eligible for Plan benefits in accordance with the terms of the Disability Income Protection Policy ("Policy"), appended to the Plan.  See id. at Ex. 2.  This Policy provides that a participant is "disabled," and is eligible to receive long-term disability benefits if there exists,

> After 26 continuous weeks of absence from work beginning with the 183rd continuous day of absence, a medical condition (or having such a condition, as the case many [sic] be) determined by the Plan Administrator to be one which is continuous and fully prevents the Employee from performing the essential duties of any position the Employee is capable of performing by virtue of his or her skills, training or experience. . . .

Id. at Ex. 2, p. B-2, Sec. 1(c).  The Plan's definition of disability further states that:

> The Plan Administrator reserves the right to require any medical evidence to be obtained and the Employee to submit to medical examination at its request that it deems appropriate or necessary in making a determination of "Disability" . . .

Id.  The Plan also provides that:

> Notwithstanding the foregoing, no Benefits shall be payable pursuant to this Policy . . . for any period of Disability due to treatment of a mental or nervous condition . . . during which an employee is not under the direct care of a Physician who is a licensed (certified) psychiatrist or psychologist or other

-16-

> mental health provider who is an eligible provider as
> determined by the Employee's health care plan.

Id. at Ex. 2, p. B-8, § 9.

At all times relevant to this claim, Metropolitan Life Insurance Company ("Met Life") provided certain disability administrative services on behalf of the Plan pursuant to a Basic Order Agreement 12091 (Ex. 3) between Digital and Met Life, including the review of first-level claims denial appeals. See Aff. of Kiernan at ¶ 10. The Plan provides, however, that the Claims Committee is to have final review of all decision under the Plan's claims appeal procedure, and may appoint people to the Committee to assist in the decisionmaking process. See Aff. of Kiernan at Ex. 2, p. 7, Section 6.4(c).

According to the Plan, the Claims Committee, as a fiduciary under the Plan, has

> discretionary authority to make such findings,
> determinations, or interpretations within the sole
> discretion of the fiduciary, and all such findings,
> determinations, and interpretations by the fiduciary
> shall be conclusive and binding on all parties,
> including [Digital], the Plan, and the Participants,
> unless a court of competent jurisdiction finds such
> finding, determination, or interpretation to be
> arbitrary and capricious and/or an abuse of discretion.
> For purposes of this paragraph, arbitrary and
> capricious shall mean "having no foundation."

Id. at Ex. 2, p. 9, Section 6.10.

## C.  Dizoglio's first-level appeal to Met Life

Dizoglio continued to receive long-term disability benefits pursuant to the Policy until March 26, 1997.  <u>See</u> Aff. of Kiernan at ¶ 14.  On that date, Met Life notified Dizoglio that his benefits had been terminated because the results of Dr. Friedman's vestibular test battery performed on February 18, 1997, had found no evidence of central or peripheral vestibular dysfunction, or any other underlying organic dysfunction to support his subjective complaints.  <u>See</u> Aff. of Kiernan, Ex. 7, § A, p.1.  Accordingly, Met Life concluded that Dizoglio's continuing claim for benefits was "not supported by the medical evidence."  <u>Id.</u> at p. 1.  Met Life explained Dizoglio's right to a first-level appeal, and expressly invited him to submit "any additional medical evidence" that supported his appeal, including "detailed findings on examination, your diagnosis, treatment and prognosis."  <u>Id.</u> at p. 1-2.

On April 2, 1997, Dizoglio formally appealed Met Life's decision to terminate his disability benefits under the Plan.  Through his attorney, Dizoglio alleged that the independent medical examination ("IME") performed by Dr. Friedman which Met Life relied upon in terminating his benefits was "self-serving," and that, in addition to his "closed head injury," he also

suffered from spondylosis, degenerative joint disease at L5/S1, neck and low back pain, ringing in the ears, sleep apnea, and vision problems.  See Aff. of Kiernan, Ex. 7, §§ B and C.

On June 26, 1997, Met Life denied Dizoglio's first level appeal, noting that the medical evidence did not support the conclusion that Dizoglio was "disabled."  See Aff. of Kiernan, Ex. 7, § D.  In denying Dizoglio's first level appeal, Met Life cited numerous medical reports in the administrative record which failed to show a physiological basis for Dizoglio's ongoing symptoms, including:

> (1) the visual analyses conducted by optometrist Dr. Elliott Lasky, on September 9, 1993 which produced normal results, and on October 1 and 15, 1993, which indicated the presence of incongruous homonymous hemianopsia, but no objective findings to substantiate Dizoglio's symptoms;
>
> (2) the October 13, 1993 polysomnographic evaluation which acknowledged Dizoglio's "significant obstructive apnea," but noted that treatment had eliminated his breathing abnormalities and normalized his sleep;
>
> (3) the endocrine evaluation conducted in March, 1994, by Dr. Robert Levine which failed to support any of Dizoglio's symptoms;
>
> (4) the neuropsychological evaluations conducted by Dr. Joan Scanlon in September, 1993, and May, 1994, which noted that there were a "variety of areas of improvement" seen in the later testing, and that "the May, 1994 test results did not suggest any cognitive difficulties that would preclude performance of Mr. Dizoglio's position, as it substantially involved the use of verbal skills and the retention of details,

-19-

where he exhibited entirely adequate functioning;"

(5) the neurological evaluations performed by Dr. James Whitlock on June 29, 1995, which concluded that Dizoglio's symptoms were "likely from an anxiety disorder, somatization disorder or a combination of the two," but not due to problems in the inner ear or the central nervous system associated with the equilibrium or vestibular dysfunction;

(6) the chiropractic evaluations by Dr. Kevin Moriarty in August, 1997, in response to Dizoglio's complaints of "low back pain," where Dr. Moriarty diagnosed lumbosacral sprain/strain with early spondylosis, cervical segmental dysfunction with possible vestibular involvement, and post closed head injury syndrome, but noted improvement after six treatments and provided no evidence of further examinations or medical support for ongoing impairment;

(7) the otoneurology consultations by Dr. Jules Friedman on February 18, 1997 which produced normal vestibular function tests and visual vestibular integration tests, "no evidence of central or peripheral vestibular dysfunction as a source of Mr. Dizoglio's symptoms," an inability to maintain normal stance that was "inconsistent with [Dizoglio's] observed normal ambulation," and the conclusion that Dizoglio's symptoms may have a "small nucleus of organicity, but that there is no consistent evidence that Mr. Dizoglio's symptoms are anything other than manifestations of a functional disorder," and that "there was a significant component of embellishment" in Dizoglio's symptoms; and finally,

-20-

(8) Dr. Scanlon's follow-up neuropsychological evaluation of May 30, 1997, which found "mild attentional variability, although marked difficulty with focused attention" and "[d]ifficulties in the visual-spatial realm" which Dr. Scanlon felt would preclude Dizoglio from driving a forklift, but not from resuming any verbal aspects of his position. In fact, Dr. Scanlon noted that "involvement in vocational activities would be imperative for curtailing Mr. Dizoglio's psychological difficulties and re-establishing his sense of competency."

See id. at 8-9. Accordingly, Met Life concluded that

the documentation does not support total disability as defined in the Digital Equipment Corporation Disability Income Protection Policy. Whether or not a definitive diagnosis is made, we must consider Mr. Dizoglio's overall physical and mental functioning/abilities. We recognize that he continues to report a number of troublesome symptoms, however, comprehensive evaluation and tests do not support restrictions in activities that should prevent him from performing the essential duties of 'any position' he is capable of performing. Accordingly, the termination of Mr. Dizoglio's claim remains in effect.

Id. at p. 9-10.

D. **Dizoglio's second-level appeal to Digital Claims Committee**

On July 14, 1997, Dizoglio submitted his second-level appeal to the Claims Committee. See Aff. of Kiernan, Ex. 7, § E. Prior to the Claims Committee's October 29, 1997, meeting, Kiernan prepared, indexed and distributed to the Claims Committee members all records the Plan had timely received in connection with Dizoglio's second-level appeal. See id.

-21-

On October 29, 1997, the Claims Committee denied Dizoglio's appeal. <u>See</u> Aff. of Kiernan ¶¶ 15-16. The Administrative Record assembled by Kiernan and the Claims Committee's written decision reflect that, in reaching their conclusion, the Committee considered and cited all of the relevant evidence submitted by Dizoglio, including the medical reports and conclusions of Drs. Timmerman, Scanlon, Moriarty, Brown, Botsford, Lasky, Hedges, Rahman, Chauvette, Whitlock, and Friedman.

In rejecting Dizoglio's appeal the Claims Committee stated

> To be eligible for benefits, the Disability Plan requires that objective medical evidence be presented to substantiate that, after 26 weeks of disability, an employee is totally disabled from performing the essential duties of any occupation based on his or her skills, training, and experience. The only evidence which supports this claim is an evaluation of Mr. Dizoglio performed by Dr. Timmerman. Dr. Timmerman has admitted no objective tests were performed as part of his analysis and the results of the evaluation were based solely on Mr. Dizoglio's comments. All objective testing and evaluation had effectively ruled out any physical causes of his symptoms and there was no other documentation to support other causation.

In light of the above, the Committee determined the medical documentation in Mr. Dizoglio's case did not reflect a condition of such severity that it prevented him from performing the essential duties of any occupation as of March 26, 1997. Therefore, the committee voted to deny his appeal.

See Aff. of Kiernan, Ex. 8 at 4. Dizoglio now appeals the Claims Committee's decision under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et. seq. (1994).

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Lehman v. Prudential Ins. Co. of America, 74 F.3d 323, 327 (1st Cir. 1996). A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] . . . may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A "material" fact is one that "affect[s] the outcome of the suit." Id. at 248. In ruling on a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. See Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir.

-23-

1988).

Where the nonmoving party bears the burden of persuasion at trial, it must "make a showing sufficient to establish the existence of [the] element[s] essential to [its] case" in order to avoid summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). It is not sufficient for the non-moving party to "rest upon mere allegation[s] or denials [contained in that party's] pleading." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson, 477 U.S. at 256). Rather, to establish a trial-worthy issue, there must be enough competent evidence "to enable a finding favorable to the nonmoving party." Id. at 842 (internal citations omitted). Where the moving party bears the burden of persuasion at trial, the movant must also support its position with materials of evidentiary quality. See Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 763 n.1 (1st Cir. 1994). Further, "[the] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Lopez v. Corporacion Azucarera de Puerto Rico, 938 F.2d 1510, 1516 (1st Cir. 1991).


## III. <u>DISCUSSION</u>

Dizoglio challenges the Claims Committee's decision

-24-

upholding the denial of his benefits on a number of grounds. I first address his procedural complaints.

A. **The Claims Committee Conducted a Full and Fair Review of Dizoglio's Claims**

Dizoglio makes a series of assertions suggesting that his right to a "full and fair review" before the Claims Committee was compromised. Among these allegations, Dizoglio complains that (1) the Claims Committee "misinformed" him about his "right" to a hearing, and never informed him of his "right" to request a hearing; (2) a quorum of Committee members was not in attendance when the Claims Committee reviewed and decided his claim; (3) the Claims Committee failed to conduct a *de novo* review of his claim; and (4) the Committee did not meet for long enough to conduct a thorough review of the claim. I address each argument in turn.

According to the terms of the Plan, appeals to the Claims Committee are "reviewed at the next scheduled meeting of the Committee, <u>at whose discretion a hearing may be called</u> for the purpose of this review." Aff. of Kiernan, Ex. 5A at ch. 12, p. 14 (emphasis added). It is clear from this language that hearings are called at the discretion of the Committee, and Dizoglio has failed to point to any evidence in the record to support his claim that he had a right to a hearing.

Dizoglio's complaint about a lack of a quorum of Committee

-25-

members on the day his claim was decided is similarly without merit. The Plan requires only that the Committee act by a majority of its members, noting that "a majority of all members [here 4 of 7] shall have the power to act and the concurrence or dissent of any member may be by telephone, electronic means, or letter." Aff. of Kiernan, Ex. 2 at Sec. 6.2. When the Committee decided Dizoglio's appeal on October 29, 1997, four of the seven Committee members voted to deny his claim - three in person and one by e-mail, as specifically permitted by the Plan.

Finally, I have reviewed the materials used by the Claims Committee to review Dizoglio's appeal. Each Committee member was provided an excellent summary of Dizoglio's claims, indexed and cross referenced to the medical documentation relating to each claim. See Aff. of Kiernan, Ex. 7. These packets were distributed to Committee members for review a week prior to the meeting. See Kiernan Dep. at 48. Dizoglio fails to provide any evidence to show that the individual committee members did not read or consider this evidence prior to the meeting. As a result, the amount of time the Committee spent discussing Dizoglio's file is of little consequence. I also agree with Digital that it would be illogical for the Committee not to reference MetLife's first-level findings in reviewing Dizoglio's

claim.

Accordingly, I conclude that the Committee provided Dizoglio with a "full and fair opportunity" for review of his claim. The Committee properly considered all the relevant medical records and other materials timely submitted by Dizoglio. At the actual meeting, Kiernan provided an overview of Dizoglio's claim, after which, there was discussion among the members of the Committee prior to its decision to deny the appeal. This is all that the Plan requires.

B.    **The Claims Committee was not Tainted by A Conflict of Interest**

The parties agree that the Plan "gives discretionary authority to the [Claims] Committee to make findings, determinations, or interpretations in connection with its role in rendering a review of a denial under the Plan." Pl.'s Obj. to Mot. For Summ. Judg. at 8. In cases such as this, where the Plan gives the Plan Administrator discretion to interpret and apply the Plan, its decision to reject a benefits claim ordinarily is reviewed under the familiar "arbitrary and capricious" standard of review. See Terry v. Bayer Corp., 145 F.3d 28, 36 (1st Cir. 1998). Dizoglio argues that this case is subject to a recognized exception to the general rule because the Claims Committee was operating under a conflict of interest when it denied his claim.

-27-

Accordingly, he argues that the decision should be reviewed *de novo*. I disagree.

In <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989), the Supreme Court stated *in dictum* that "of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" <u>Id.</u> at 115, quoting Restatement (Second) of Trusts § 187 comment d (1959). Although the <u>Firestone</u> Court did not explain how to determine whether a conflict of interest exists in a particular case, the First Circuit recently provided some guidance on this issue in <u>Doyle v. Paul Revere Life Ins. Co.</u>, 144 F.3d 181 (1st Cir. 1998).[3] In <u>Doyle</u>, the court held

---

[3] Other circuit courts have addressed the issue in a variety of different ways. <u>See e.g.</u>, <u>Armstrong v. Aetna Life Ins. Co.</u>, 128 F.3d 1263, 1265 (8th Cir. 1997)(reviewing case de novo when conflict present); <u>Sullivan v. LTV Aerospace & Defense Co.</u>, 82 F.3d 1251, 1255 (2d Cir. 1996)(burden on claimant to prove that conflict improperly motivated denial of benefits); <u>Chambers v. Family Health Plan Corp.</u>, 100 F.3d 818, 824-27 (10th Cir. 1996)(adopting sliding scale approach); <u>Doe v. Group Hospitalization & Med. Serv.</u>, 3 F.3d 80, 87 (4th Cir. 1993) (same); <u>Wildbur v. ARCO Chem. Co.</u>, 974 F.2d 631, 638-42 (5th Cir. 1992)(same); <u>Van Boxel v. Journal Co. Employees' Pension Trust</u>, 836 F.2d 1048, 1052-53 (7th Cir. 1987)(same); <u>Atwood v. Newmont Gold Co.</u>, 45 F.3d 1317, 1323 (9th Cir. 1995)(presuming conflict and shifting burden of proof to insurer); <u>Brown v. Blue Cross & Blue Shield of Alabama, Inc.</u>, 898 F.2d 1556, 1566-67 (11th Cir. 1990)(same).

that: (1) the party alleging the existence of a conflict has the burden of demonstrating that the Plan Administrator was "improperly motivated"; (2) this burden is not satisfied when the only evidence of an alleged conflict is an admission by the Plan Administrator that it is a subsidiary of the plaintiff's employer and will be responsible for paying the claim from its own funds; and (3) where a conflict of interest has not been demonstrated, a decision denying benefits will be upheld as long as the decisionmaker "had substantial evidentiary grounds for a reasonable decision in its favor." Id. at 184.[4]

The only evidence of a conflict of interest in this case are the Plan's admissions that the Claims Committee is comprised of high ranking Digital officials, and that it may cost Digital more to fund its share of the Plan if Dizoglio is awarded benefits. These allegations are insufficient to establish that the members of the Claims Committee were improperly motivated when they voted to deny Dizoglio's claim. See e.g., Chalmers v. Quaker Oats Co., 61 F.3d 1340, 1344 (7th Cir. 1995) (noting that Quaker Oats, with

_____

[4] The court also suggested *in dictum* that where a conflict has been established, the court will give "more bite" to the arbitrary and capricious standard by adhering to the standard but placing a "special emphasis on reasonableness." Doyle, 144 F.3d at 184; see also Doe v. Travelers Ins. Co., 167 F.3d 53, 57 (1st Cir. 1999) (assuming that decision denying benefits is reviewed for reasonableness when conflict of interest is present).

-29-

an annual revenue of nearly $6 billion is "not likely to flinch at paying out $240,000"); <u>Van Boxel v. Journal Company Employees' Pension Trust</u>, 836 F.2d 1048, 1051 (7th Cir. 1987) (recognizing that the amount of the benefit may be "too slight to compromise impartiality of the trustees"). Accordingly, I review the Committee's decision by using the arbitrary and capricious standard of review.

**C. Digital arbitrarily construed the Plan to require "objective medical evidence" in order to prove a disability claim**

In rejecting Dizoglio's claim, the Claims Committee stated that,

> To be eligible for benefits, the Disability Plan <u>requires that objective medical evidence be presented</u> to substantiate that, after 26 weeks of disability, an employee is totally disabled from performing the essential duties of any occupation based on his or her skills, training, and experience.

See <u>id.</u> (emphasis added). After examining the evidence presently in the record, however, I find no requirement in Digital's Disability Plan that a claimant must provide objective medical evidence as a prerequisite for a finding of disability. Dizoglio argues that the imposition of such a requirement by the Claims Committee where none is stated in the Plan is arbitrary and capricious. I agree.

Digital correctly asserts that in cases such as this, an

-30-

administrator's interpretation of Plan terms is entitled to deference.  See Firestone, 489 U.S. at 111 (Court's function is to determine whether any reasonable basis exists for the fiduciary's decision); Terry, 145 F.3d at 36-38 ("a fiduciary's interpretation of a plan will not be disturbed if reasonable"); Doyle, 144 F.3d at 185 (fiduciary's discretionary power includes not only factual findings, but interpretation of plan terms).  I find, however, that the Plan language in this case cannot plausibly be construed to require objective medical evidence as a prerequisite to a disability claim.

Digital's Plan provides that a participant is "disabled" and eligible for long-term disability benefits if there exists

> After 26 continuous weeks of absence from work beginning on the 183rd continuous day of absence, a medical condition[5]. . . determined by the Plan Administrator to be one which is continuous and fully prevents the Employee from performing the essential duties of any position the Employee is capable of performing by virtue of his or her skills, training, or experience.

Aff. of Kiernan at Ex. 2. p. B-2, Sec. 1(C).  The Plan further provides that

> The Plan Administrator reserves the right to require any medical evidence to be obtained and the Employee to submit to medical examinations at its request that it

---

[5]  The term "medical condition" is not defined anywhere in the Plan.

-31-

> deems appropriate or necessary in making a
> determination of "Disability" at any time. . .

Id. Finally, the Plan notes that,

> An Employee's right to receive any Benefit hereunder is
> further conditioned upon the receipt by the Plan
> Administrator of <u>all medical information requested. . .
> to substantiate the existence of a Disability</u>.

Id. at B-11, Sec. 13(B)(emphasis added). Nowhere on the face of the Plan is there any mention of a requirement to provide objective medical evidence as a prerequisite to proving disability.

Although the First Circuit has not yet spoken on the subject, other courts which have considered the issue have concluded that it is arbitrary and capricious for an administrator to "interpret" a requirement into a Plan that is absent from the Plan's language. See, e.g., <u>Mitchell v. Eastman Kodak Co.</u>, 113 F.3d 433, 442 (3d Cir. 1997)(concluding it arbitrary and capricious for an administrator to require "objective medical evidence" to prove disability in interpreting a Plan containing no such requirement); <u>Miles v. New York State Teamsters Conf. Pension and Retirement Fund Employee Pension Ben. Plan,</u> 698 F.2d 593, 599 (2d Cir. 1983)(noting that it is arbitrary and capricious for administrator or fiduciary to add a term or extra requirement which is not expressly part of the

Plan); <u>Duncan v. Continental Cas. Co.</u>, 1997 WL 88374, at *4 (N.D.Cal. Feb. 10, 1997)(insurance company could not deny disability claim for lack of objective medical evidence where original policy did not refer to the objective medical evidence standard and never defined the term); <u>Durr v. Metropolitan Life Ins. Co.</u>, 15 F. Supp. 2d 205, 211 (D. Conn. 1998)(same); <u>Velez v. Prudential Health Care Plan of New York, Inc.</u>, 943 F. Supp. 332, 342 (S.D.N.Y. 1996)(same). <u>See</u> <u>also</u>, <u>Dewitt v. Penn-Del Directory Corp.</u>, 106 F.3d 514, 520 (3d Cir.1997) (administrator's discretionary interpretation of plan "may not controvert the plain language of the [plan] document") (citing <u>Gaines v. Amalgamated Ins. Fund</u>, 753 F.2d 288, 289 (3d Cir. 1985)). Accordingly, I find that the Committee acted arbitrarily and capriciously in importing an "objective medical evidence" requirement into the Plan where none is expressly stated.

**D.   Remand is required to permit the administrator to interpret the Plan using the correct legal standard**

Although I find that the Committee's decision was arbitrary and capricious, I do not conclude that the Committee should necessarily have granted Dizoglio's claim based on the evidence in the record. In fact, the evidence presently in the record weighs heavily against such a conclusion. Nevertheless, because the Committee employed an improper legal standard (requiring

-33-

objective medical evidence where none was mandated by Plan terms) in drawing its conclusion about Dizoglio's disability, I must remand Dizoglio's case to the fund for reconsideration.  See Recupero v. New England Tel. & Tel. Co., 118 F.3d 820, 830-31 (1st Cir. 1997)(noting the propriety of remand to fiduciary); Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455, 460 (9th Cir. 1996) (remand appropriate when fiduciary has misconstrued a plan and applied a wrong standard to benefits determination); Schadler v. Antham Life Ins. Co., 147 F.3d 388, 398 (5th Cir. 1998) ("it is not the court's function *ab initio* to apply the correct standard . . . [t]hat function, under the Plan, is reserved to the Plan administrator");  Doe v. Travelers, 971 F. Supp. 623, 636 (D. Ma. 1997)(remand to fiduciary appropriate when reviewing court determines that process by which decision was made failed to measure up to requirements of procedural fairness) (rev'd in part, on other grounds, by Doe v. Travelers Ins. Co., 167 F.3d 53 (1st Cir. 1999)).  While it is unlikely that the Committee will ultimately award disability benefits to Dizoglio, because I cannot conclude that no reasonable factfinder could find for Dizoglio, I must remand the case for further review.  Compare Miller v. United Welfare Fund, 72 F.3d 1066, 1073 (2d Cir.

-34-

1995)(remand to the fiduciary is appropriate when reasonable minds could differ as to the proper outcome of the case) with Zuckerbrod v. Phoenix Mut. Life Ins. Co., 78 F.3d 46, 50 (2d Cir. 1996) (remand to the fiduciary for further consideration is unnecessary where the outcome is so certain that a remand would be a "useless formality").

## III.  CONCLUSION

Defendant's motion for summary judgment (Document No. 9) is denied.  Plaintiff's cross-motion for summary judgment (Document No. 11) is granted in part and denied in part.  The case is remanded to the Committee for further consideration as directed, and I retain jurisdiction to hear and decide any timely motion for judicial review filed after further proceedings before the Committee.

SO ORDERED

_____
Paul Barbadoro
Chief Judge

July 23, 1999

cc:  Janine Gawryl, Esq.
     Naomi Mooney, Esq.
     Joseph Piacquad, Esq.